Present:  All the Justices

ROBERT STACY YARBROUGH

                                                OPINION BY
v.  Record Nos. 990261, 990262 JUSTICE LAWRENCE L. KOONTZ, JR.
                                            September 17, 1999
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
                    Charles L. McCormick, III, Judge


     In this appeal, as required by Code § 17.1-313(A), we

review the capital murder conviction and death sentence imposed

upon Robert Stacy Yarbrough.[1]

                            I. BACKGROUND

     Under familiar principles of appellate review, we will

review the evidence in the light most favorable to the

Commonwealth, the party prevailing below.  Clagett v.

Commonwealth, 252 Va. 79, 84, 472 S.E.2d 263, 265 (1996), cert.

denied, 519 U.S. 1122 (1997).  Yarbrough and Dominic Jackson

Rainey had attended high school together in Mecklenburg County

prior to Rainey's moving to Richmond with his mother.  While on

a subsequent visit to see his grandfather in Mecklenburg County,

---

     [1]Record number 990262 is the appeal of Yarbrough's related
conviction for robbery which was transferred to this Court from
the Court of Appeals.  Although Yarbrough seeks to have this
conviction overturned, none of his assignments of error presents
a direct challenge to the merits of that conviction.
Accordingly, his conviction and sentence of life imprisonment on
that charge will be affirmed.

Rainey renewed his acquaintance with Yarbrough. On May 7, 1997, Yarbrough told Rainey of his plan to rob Cyril Hugh Hamby, the 77-year-old owner of Hamby's Store on U.S. Route 1 in Mecklenburg County. The following evening, Yarbrough went to Rainey's grandfather's house and told Rainey that "he was ready to go rob Mr. Hamby."

Yarbrough and Rainey were seen walking along U.S. Route 1 toward Hamby's Store between 9:30 and 10:30 p.m. on May 8, 1997. Yarbrough was armed with a shotgun. The two men waited at a picnic table across the road until there were no customers in the store. Yarbrough hid the shotgun under his coat and the two men entered the store. At Yarbrough's direction, Rainey locked the front door.

Yarbrough pointed the shotgun at Hamby and ordered him to come out from behind the store's counter. Yarbrough and Rainey took Hamby to the living quarters at the rear of the store where they found an electrical extension cord and string. Yarbrough brought Hamby back into the public area of the store, forced him to lie on the floor in an aisle, and tied Hamby's hands behind his back with the extension cord and string.

Yarbrough went to the store's electrical circuit box and turned off the outside lights. He then demanded that Hamby reveal where guns were hidden in the store. When Hamby denied

2

having any guns, Yarbrough kicked Hamby in the head and upper left arm.  Yarbrough then forced the store's cash register open by dropping it on the floor and took the money that was in the register.

Yarbrough returned to where Hamby was lying and, pointing the shotgun at him, again demanded to be told where guns were hidden in the store.  When Hamby again denied having any guns, Yarbrough put down the shotgun, took a knife from his pocket, and began to cut Hamby's neck with a "sawing motion" as Hamby pleaded with Yarbrough to stop.  After cutting Hamby's neck at least ten times, Yarbrough rifled through Hamby's clothing and took his wallet.  Yarbrough and Rainey took beer, wine, and cigarettes from the store and left by the back door.  Yarbrough gave Rainey one hundred dollars in small bills and kept a larger sum for himself.

Yarbrough and Rainey returned to Rainey's grandfather's house to change clothes and then went to the home of Conrad Dortch to buy marijuana.  Dortch was not at home, so Yarbrough and Rainey waited on the porch and drank the wine taken during the robbery.  Dortch arrived home at approximately 12:45 a.m. and sold Yarbrough a marijuana cigarette for $10.  According to Rainey, Yarbrough was "flashing" his money.  When Yarbrough and

Rainey left Dortch's home, Rainey threw an empty wine bottle into the yard.

Yarbrough and Rainey returned to Rainey's grandfather's house where they spent the remainder of the night. Before leaving in the morning, Yarbrough threw his tennis shoes, which were stained with Hamby's blood, into a trash barrel behind the house.

Hamby's body was discovered at approximately 8:20 a.m. on May 9, 1997 by Betsy Russell, a former employee of Hamby's who had been informed by a neighbor that "there was something wrong at the store." A subsequent autopsy revealed that Hamby had bled to death as a result of deep, penetrating wounds to his neck. According to a state medical examiner, Hamby's wounds were "entirely consistent" with an attempted beheading, however, because no major arteries were cut, it would have taken at least several minutes for Hamby to have bled to death. Hamby also had several blunt force injuries to his head and upper left arm consistent with his having been kicked with moderate force.

On May 10, 1997, Dortch contacted the Virginia State Police and told them of his encounter with Yarbrough and Rainey. Police later recovered a wine bottle and label from Dortch's yard. The wine bottle was of a brand that was sold at Hamby's store.

4

On May 14, 1997, police executed a search warrant at Yarbrough's home and recovered bloodstained clothing and a three-bladed "Uncle Henry" pocketknife. Police also recovered Yarbrough's tennis shoes from the trash barrel behind Rainey's grandfather's house. DNA testing of the bloodstains found on Yarbrough's shoes and clothing established a positive match with Hamby's blood. DNA tests of blood traces found on the "Uncle Henry" knife established that a mixture of Hamby's and Yarbrough's DNA was present on the blade of the knife.

Forensic analysis of the bloodstain patterns on Yarbrough's clothing supported the conclusion that they were consistent with a spray of blood resulting from trauma. An expert testified that the bloodstains on the lower front of Yarbrough's shirt were made "in close proximity to the trauma that released the blood." Several shoeprints found in the store were identified as having been made by Yarbrough's shoes, including those near the circuit box, behind the counter, and in the bloodstains near Hamby's head. Police also recovered Rainey's boots and identified prints found near Hamby's feet and in the living quarters as having been made by these boots.

## II. PROCEEDINGS

### A. Pre-trial

On September 8, 1997, after Yarbrough had been arrested, but before he was indicted for Hamby's murder, the Commonwealth filed a motion for the appointment of a special assistant prosecutor. In that motion, the Commonwealth relied on Code § 19.2-155, which permits the appointment of a special prosecutor where the local Commonwealth's Attorney is unable to fulfill his duties by reason of temporary disability or ethical disqualification. The Commonwealth further asserted that "it would be proper to have another attorney assist in prosecuting [Yarbrough] because of the complex nature of the case." (Emphasis added.)

Following an ex parte hearing, the trial court granted the Commonwealth's motion and appointed Warren Von Schuch, an assistant Commonwealth's Attorney for Chesterfield County, as a special assistant prosecutor. In doing so, the trial court cited Code § 19.2-155 and made reference to Von Schuch's experience with complex cases.

On September 25, 1997, Yarbrough filed a motion to vacate the appointment of Von Schuch. The trial court agreed to review its prior order and permitted Yarbrough to present argument opposing the Commonwealth's renewed motion for appointment of a

6

special assistant prosecutor.  After hearing argument from both Yarbrough and the Commonwealth, the trial court vacated the prior order and then granted the Commonwealth's renewed motion, again appointing Von Schuch to assist in the prosecution of Yarbrough.  In doing so, the trial court relied on its inherent authority to administer cases on its docket, making no reference to Code § 19.2-155.

During its December 1997 term, the Mecklenburg County grand jury indicted Yarbrough for capital murder of Hamby during the commission of a robbery, Code § 18.2-31(4), and robbery of Hamby, Code § 18.2-58.  On January 30, 1998, Yarbrough filed a motion and supporting memorandum challenging the constitutionality of Virginia's capital murder statute and capital punishment sentencing and appellate review procedures on multiple grounds.  The trial court heard argument on this motion and other pre-trial matters on May 4, 1998.  In an order entered June 24, 1998 nunc pro tunc to May 4, 1998, the trial court overruled the motion in its entirety without specific comment.

B. Guilt-determination Phase

A four-day jury trial commenced in the trial court on June 23, 1998.  At that trial, the Commonwealth presented evidence in accord with the above-recited facts.  Rainey was the principal witness for the Commonwealth.  In his testimony, Rainey stated

7

that on the way to Hamby's Store he told Yarbrough that "I was ready to go back to the house, I didn't want to go." Yarbrough threatened "to do something" to Rainey if he did not assist in the robbery. Rainey then described in detail the events leading up to the killing. According to Rainey, when Yarbrough pulled the knife from his pocket, Rainey protested and asked Yarbrough what he planned to do. Yarbrough did not respond and "started to cut Mr. Hamby . . . around the [front of the] neck. And then after he finished, he cut him on the back of the neck." Rainey further testified that when Yarbrough first started the cutting, Hamby "was saying 'please' and 'no'."

David Thompson testified that he saw Yarbrough and Rainey walking toward Hamby's Store between 9:30 and 10:30 on the evening of the murder. Dortch also testified, relating the incidents of his encounter with Yarbrough and Rainey later that night. The Commonwealth presented extensive testimony and physical evidence through police investigators and forensic experts.

At the conclusion of the Commonwealth's evidence, Yarbrough moved to strike "the capital aspect of the murder charge" on the ground that Rainey's accomplice testimony was the only evidence from which the jury could find that Yarbrough, and not Rainey, was the actual killer. Yarbrough contended that Rainey's

8

testimony was unreliable and inherently self-serving.  The trial court overruled the motion to strike stating that the Commonwealth had made out a prima facie case through Rainey's testimony and the forensic evidence.

Yarbrough called as witnesses the assistant principal and a teacher from the high school Yarbrough and Rainey had attended.  Each testified that they knew Rainey and that "[h]is reputation is not that good in reference to honesty."  Yarbrough called no other witnesses and did not testify on his own behalf.

At the conclusion of the evidence, Yarbrough renewed his motion to strike the capital element of the murder charge, again asserting that Rainey's testimony was not sufficiently credible to permit the jury to find that Yarbrough, and not Rainey, had cut Hamby's neck.  The trial court overruled the motion.  The jury returned its verdict against Yarbrough, finding him guilty of the capital murder and robbery of Hamby.

C. Penalty-determination Phase

After the jury returned its verdict finding Yarbrough guilty of capital murder and robbery, the penalty-determination phase of the trial immediately commenced.  Prior to the presentation of evidence, the trial court received proposed jury instructions.  At that time, the Commonwealth indicated that it would present evidence and argument solely on the issue of

whether the death penalty was warranted because Yarbrough's crime was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim," commonly referred to as the "vileness" aggravating factor. See Code § 19.2-264.2. Accordingly, the jury was not to be instructed to consider the probability that Yarbrough "would commit criminal acts of violence that would constitute a continuing serious threat to society," the "future dangerousness" aggravating factor. Id.

Yarbrough, asserting that he would be ineligible for parole if given a sentence of life imprisonment, proffered the following jury instruction: "The words 'imprisonment for life' mean imprisonment for life without possibility of parole." The Commonwealth opposed the instruction on the ground that Simmons v. South Carolina, 512 U.S. 154 (1994), and its application in prior decisions of this Court required a "life means life" instruction only where the Commonwealth sought to prove the future dangerousness aggravating factor. Yarbrough contended that where a "life means life" instruction is given, the jury tends to favor life imprisonment over the death penalty and that the Commonwealth chose not to present evidence on future dangerousness in order to avoid the applicability of such an instruction. Yarbrough asserted that the instruction was

10

nonetheless appropriate as a matter of fundamental fairness and to assure a lack of juror confusion even in the absence of an assertion of future dangerousness. The trial court refused Yarbrough's "life means life" instruction, stating that it was not appropriate under the current state of the law in Virginia where the Commonwealth relies only on the vileness aggravating factor.

The Commonwealth's evidence during the penalty-determination phase of the trial consisted of the testimony of several of Hamby's relatives and an acquaintance. Yarbrough called his mother as a witness on his behalf.

During closing argument Yarbrough's counsel did not expressly assert that Yarbrough would be ineligible for parole, but did assert that "[l]ife is life . . . [h]e will spend a long time in prison" and suggested that Yarbrough's life span would determine the number of years he would serve in prison. After the Commonwealth's closing argument, Yarbrough again sought to have the jury instructed that he would be ineligible for parole should he be given a life sentence, asserting that the Commonwealth had implicitly argued that Yarbrough would present a continuing danger to society if not given the death sentence. The trial court again refused to give the instruction, finding

that the Commonwealth's argument had not implicated the issue of Yarbrough's future dangerousness.

After deliberating for some time, the jury sent a question to the trial court. The trial court indicated to counsel that "[i]t is the same question we always have." The jury's note read:

> If possible:
>     Will you please define "life in prison?" Does that mean your entire life or does it have a certain limit such as 12 years? (is there a specific limit already set?)
>
> Does that also include parole will be offered after a specified number of years have been served?

Yarbrough again urged the trial court to define life imprisonment as life imprisonment without possibility of parole. The Commonwealth again asserted that the instruction was not proper and asked the trial court to refuse to answer the jury's question. The trial court recalled the jury to the courtroom and responded to the question, saying

> The only way I can answer [the jury's question] under the present law in Virginia, as I understand it, is to say to you that I can't answer it, and that is that in sentencing you must do what you feel is appropriate under the circumstances of this case and not concern yourselves with what might happen afterwards.

The jury then deliberated further and sentenced Yarbrough to death for the capital murder of Hamby and to life imprisonment for the associated robbery charge.

D. Post-trial

Following the preparation of a pre-sentence report, the trial court received argument from counsel on confirming the jury's sentence of death.  In arguing to set aside the death sentence, Yarbrough's counsel asserted the trial court was "wrong in not telling" the jurors that Yarbrough would have been parole-ineligible because "[t]his Court knows the truth, that there is no parole."  The trial court, without comment, imposed the jury's verdict and sentence.  This appeal followed.

### III. DISCUSSION

We begin by noting that Yarbrough has neither briefed nor presented oral argument on the fourth assignment of error originally designated by him under Rule 5:22(b).  That assignment of error asserted that the trial court erred in denying Yarbrough's motion in limine to exclude certain physical evidence and laboratory analysis of that evidence for failure of the Commonwealth to establish the necessary chain of custody.  At oral argument of this appeal, Yarbrough conceded that the failure to address an assignment of error constituted a waiver of the issue asserted therein.  Sheppard v. Commonwealth, 250 Va. 379, 386, 464 S.E.2d 131, 135 (1995), cert. denied, 517 U.S. 1110 (1996).  Accordingly, we will not address the issue asserted in assignment of error number 4.  Moreover, we will

13

address the remaining assignments of error as originally

designated in the Rule 5:22(b) statement.  Id. at 385-86, 464

S.E.2d at 135.

A. Issues Previously Decided

In assignment of error number 7, Yarbrough raises various

challenges to the constitutionality of Virginia's capital murder

statute and the statutory scheme under which capital murder

trials are conducted and death sentences are reviewed on appeal.

The arguments raised within this assignment of error have been

thoroughly addressed and rejected in numerous prior capital

murder cases.[2]  We find no reason to modify our previously

expressed views on these issues.

---

[2]See, e.g., Smith v. Commonwealth, 219 Va. 455, 476-77, 248 S.E.2d 135, 148 (1978), cert. denied, 441 U.S. 967 (1979) ("vileness" and "dangerousness" predicates for imposition of the death penalty do not impermissibly fail to guide the jury's discretion); Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 675, cert. denied, 513 U.S. 971 (1994) (method of instructing jury on mitigation does not impermissibly interfere with jury's consideration of evidence offered in mitigation); Joseph v. Commonwealth, 249 Va. 78, 82, 452 S.E.2d 862, 865, cert. denied, 516 U.S. 876 (1995) (death penalty does not constitute cruel and unusual punishment; appellate review process does not deprive defendant of statutory rights and due process of law); Payne v. Commonwealth, 233 Va. 460, 473-74, 357 S.E.2d 500, 508-09, cert. denied, 484 U.S. 933 (1987) (procedures for appellate review of death penalty cases, including expedited review, provide a meaningful appeal and are constitutional).

14

B. Appointment of Special Assistant Prosecutor

In assignment of error number 1, Yarbrough asserts that the trial court erred in granting the Commonwealth's renewed motion to appoint as a special assistant prosecutor an assistant Commonwealth's Attorney from another jurisdiction.  Yarbrough contends that by its express terms Code § 19.2-155, the statute relied upon by the Commonwealth in originally seeking the appointment and cited by the trial court in its original order, applies only where "the attorney for the Commonwealth . . . is unable to act, or to attend to his official duties as attorney for the Commonwealth, due to sickness, disability or other reason of a temporary nature," such as a fiduciary or familial relationship to the accused, or some other ethical bar.

Yarbrough correctly asserts that no conflict or disability was present that would have prohibited the Commonwealth's Attorney for Mecklenburg County from prosecuting the case. Indeed, the Commonwealth's Attorney served as lead counsel for the Commonwealth throughout the trial.  Additionally, Yarbrough asserts that a further provision of Code § 19.2-155 permitting a trial court to appoint "as a special assistant attorney for the Commonwealth, without additional compensation, an attorney employed by a state agency" upon request of the Commonwealth and upon a finding by the trial court that "such appointment will

aid in the prosecution of a particular case or cases" is also inapplicable. Yarbrough asserts that this is so because the special assistant prosecutor named by the trial court in this instance was an assistant Commonwealth's Attorney and, thus, he was an employee of a locality, not a state agency.[3]

We need not address these contentions, however, because the trial court vacated its original ex parte order citing Code § 19.2-155. In the subsequent order appointing the special assistant prosecutor, entered after Yarbrough was afforded an opportunity to be heard and oppose the Commonwealth's renewed motion, the trial court relied solely on its inherent authority to administer cases on its docket. Thus, we need only be concerned with whether the appointment of a special prosecutor on motion of the Commonwealth falls within this broad discretion afforded to a trial court. This is a matter of first impression and one of obvious import to the conduct of criminal trials in this Commonwealth.

Code § 15.2-1628(C), requiring the Commonwealth's Attorneys of most counties and their assistants to devote full time to their duties, provides that

---

[3]We note, however, that a Commonwealth's Attorney is a constitutional officer and that the State Compensation Board must authorize the employment of assistant Commonwealth's Attorneys. Code §§ 15.2-1626, -1632, and -1633.

[n]otwithstanding any other provisions of law, no attorney for the Commonwealth or assistant required to devote full time to his duties shall receive any additional compensation from the Commonwealth or any county or city for substituting for or assisting any other attorney for the Commonwealth or his assistant in any criminal prosecution or investigation.

The clear import of this statute, and an identical provision of Code § 15.2-1630 applicable to the Commonwealth's Attorneys for independent cities and their assistants, is that the prosecutors from one locality may call upon the prosecutors of another locality to assist in complex litigation. Indeed, because a Commonwealth's Attorney, no less than any other member of the bar, is subject to the rules of professional responsibility, the duty of competence may require a Commonwealth's Attorney of lesser experience to seek the association of more experienced counsel when prosecuting a difficult, complex case. This being true, certainly a trial court does not abuse its discretion in permitting the Commonwealth to obtain the assistance of a Commonwealth's Attorney or assistant Commonwealth's Attorney from another jurisdiction who has greater familiarity with the issues involved in such prosecutions and whose services are to be rendered without additional expense to the taxpayers.

Yarbrough contends, however, that "[a] prosecutor from outside the county will not have the same sense of dedication to

17

the citizens of the county, including the defendant" and, thus, "[t]he out-of-county prosecutor has a legal disability" analogous to that of the disability of a prospective juror who is excused from jury service because he or she has not been a resident of the locality in which a trial occurs for at least six months. See Code § 8.01-337. We disagree.

The statutory residency requirements for determining the pool of potential jurors in a locality may arguably be taken as securing the right of a defendant to a trial by a jury of his peers. To suggest, however, that a similar residency requirement should be imposed upon a prosecutor is totally without merit.

In the first place, the statutes governing the appointment of assistant Commonwealth's Attorneys contain no requirement of residency in the locality in which they are employed. See Code §§ 15.2-1628 and -1630. Secondly, as noted above, the rules of professional responsibility place upon a Commonwealth's Attorney the same burdens and duties as any attorney. Paramount among these responsibilities is the duty to perform competently and to perform his duties to the fullest extent permitted and required by the law. We presume that any Commonwealth's Attorney, cognizant of his or her professional responsibility, will perform the duties required of the office without regard to the

18

locality in which he or she is called upon to render service.
Finally, and moreover, the appointment of a special assistant
attorney for the Commonwealth does not prejudice the defendant.
This is necessarily so simply because such an appointment does
not alter the truth-finding process of the defendant's trial.

For these reasons, we hold that it rests within the sound
discretion of the trial court to appoint a Commonwealth's
Attorney or an assistant Commonwealth's Attorney to assist the
regular Commonwealth's Attorney where the Commonwealth requests
the appointment for good cause.  In the present case, the trial
court did not err in granting the Commonwealth's requested
appointment of a special assistant prosecutor.

C. Credibility and Sufficiency of Evidence of Capital Murder

In assignments of error 5 and 6, Yarbrough asserts that the
trial court erred in failing to strike the capital aspect of the
murder indictment and in imposing the jury's verdict with
respect to capital murder.  As he did at trial, Yarbrough
maintains that the evidence adduced by the Commonwealth fails to
establish that he, and not Rainey, was the actual instigator and
perpetrator of the robbery and killing of Hamby.  Yarbrough
asserts that Rainey's accomplice testimony lacked sufficient
credibility and that, absent credible corroboration from direct
testimony, the forensic evidence established only that Yarbrough

19

was present at the time of the murder. Thus, he contends that the evidence failed to support the indictment for capital murder or, in the alternative, that the jury could not find him guilty of capital murder because of reasonable doubt arising from Rainey's accomplice testimony.

Yarbrough further contends that even if he could be found guilty of capital murder, the evidence was insufficient for the jury to find in the penalty-determination phase that the killing involved torture or an aggravated battery and, thus, that the Commonwealth had failed to sustain its burden of proof as to the vileness aggravating factor. Code § 19.2-264.2.

Specifically, Yarbrough asserts that the Commonwealth did not establish that Hamby was conscious at the time of the murder because the forensic evidence did not show that Hamby struggled or resisted, which, Yarbrough contends, would be inconsistent with Rainey's testimony that Hamby pleaded with Yarbrough to stop. Thus, he contends that the Commonwealth failed to prove that the murder was necessarily vile in that it involved torture of the victim.

Similarly, Yarbrough contends that the forensic evidence failed to establish that the manner in which the killing occurred constituted an aggravated battery beyond the minimum necessary to accomplish an act of murder. Thus, Yarbrough

20

contends that the Commonwealth failed to establish the necessary criteria from which the jury could find the murder to have been sufficiently vile to warrant imposition of the death penalty.[4] For the reasons that follow, we disagree with each of these contentions.

"[T]he credibility of witnesses and the weight to be accorded their testimony are questions for the fact finder." Saunders v. Commonwealth, 242 Va. 107, 113, 406 S.E.2d 39, 42, cert. denied, 502 U.S. 944 (1991).  Where the jury has seen and heard the witnesses and assessed their credibility and the weight of their testimony, its determination of the facts will not be overturned on appeal unless it is plainly wrong or without evidence to support it.  Code § 8.01-680.  Where the testimony of an accomplice comports with and is corroborated by the forensic evidence, that testimony is not inherently incredible.  Cardwell v. Commonwealth, 248 Va. 501, 512, 450 S.E.2d 146, 153 (1994), cert. denied, 514 U.S. 1097 (1995).  In such a case, the determination of whether the accomplice's version of events is to be believed rests soundly within the discretion of the jury.  See, e.g., Joseph v. Commonwealth, 249

---

[4]Yarbrough offered no express argument that the Commonwealth failed to prove by sufficient evidence that the murder was the result of a depravity of mind, the third criterion that may be used to establish vileness.  See Code § 19.2-264.2.

21

Va. 78, 86-87, 452 S.E.2d 862, 868, cert. denied, 516 U.S. 876 (1995). Accordingly, we hold that Rainey's testimony, which was corroborated by the forensic evidence, was not inherently incredible and, thus, that the Commonwealth's evidence was sufficient to permit the jury to find that Yarbrough killed Hamby.

Similarly, the question whether Hamby was conscious during the murder is resolved by Rainey's testimony that Hamby pleaded with Yarbrough as Yarbrough cut Hamby's neck. Because this testimony was not inherently incredible particularly in light of the state medical examiner's testimony that it would have taken several minutes for Hamby to have bled to death, the jury reasonably could have found that Hamby was conscious throughout the entire ordeal. Moreover, the fact that the forensic evidence failed to establish that the 77-year-old victim struggled does not necessarily support the conclusion that he was unconscious. Indeed, it is just as reasonable for the jury to have concluded that Hamby did not struggle in order to show his submission to the threats being made by Yarbrough. While Yarbrough may selectively craft an interpretation of the evidence to suit his theory that Hamby was not conscious during the murder, "the trial court, and this Court on appeal, may not substitute its own judgment for that of the jury where a

22

reasonable interpretation of the evidence supports the verdict."
Atkins v. Commonwealth, 257 Va. 160, 176, 510 S.E.2d 445, 455-56 (1999).

In support of his contention that the murder did not involve an aggravated battery, Yarbrough asserts on brief that although the method by which the killing was accomplished was "inept and inefficient . . . the evidence never established that one or even several cuts would have resulted in Hamby's death." Thus, he argues that the jury could not find that the killing was the result of an aggravated battery beyond the minimum necessary to accomplish an act of murder.  In essence, Yarbrough contends that because the forensic evidence showed that none of the individual cuts in Hamby's neck would have been fatal, Hamby's death from loss of blood was necessarily the result of all the multiple wounds and, thus, these wounds constituted the minimum force necessary to accomplish the murder.

In defining an "aggravated battery" as "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder," Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979), we have never expressly confined our consideration of the acts taken to accomplish the murder to those wounds which actually caused the victim's death.

23

To the contrary, we have held that acts that facilitate the murder, such as restraining the victim by force or assaulting the victim in the commission of a predicate felony are additional factors to be considered.  See, e.g., Hedrick v. Commonwealth, 257 Va. 328, 338-39, 513 S.E.2d 634, 640 (1999). Here, the evidence fairly establishes that Yarbrough both restrained and assaulted Hamby in order to facilitate the murder, acts which constituted an aggravated battery beyond that necessary to accomplish the murder.

Moreover, in proving the aggravating factor of vileness under Code § 19.2-264.2, we have consistently held that it is necessary for the Commonwealth to prove only that the murder "involves torture, depravity of mind, or aggravated battery to the victim."  Bunch v. Commonwealth, 225 Va. 423, 442, 304 S.E.2d 271, 282, cert. denied, 464 U.S. 977 (1983)(emphasis added); see also Hedrick, 257 Va. at 339-40, 513 S.E.2d at 640. In other words, the use of the disjunctive "or" indicates that only one criterion must be established, though the Commonwealth may attempt to prove more than one.  Here, as we have demonstrated, the evidence established at least two of those criteria.  Accordingly, the evidence was sufficient for the jury reasonably to find that Yarbrough was Hamby's killer and that the manner in which the killing occurred was sufficiently vile

24

to warrant imposition of the death penalty and, thus, that the trial court did not err in refusing to strike the capital aspect of the indictment.

## D. "Life Means Life" Instruction

In assignments of error 2 and 3, Yarbrough contends that the trial court erred in failing to instruct the jury that he would be ineligible for parole if given a sentence of life imprisonment and that the trial court further erred in failing to respond to the jury's question on this issue with an instruction that life imprisonment means life without possibility of parole. In making his argument, both in the trial court and on appeal, Yarbrough asserts that the holding of Simmons should be extended to all capital cases, and not limited to those in which the prosecution relies on the aggravating factor of the defendant's future dangerousness to society. See Simmons, 512 U.S. at 178 (O'Connor, J., concurring). The Commonwealth contends that we have already limited the application of the Simmons holding to those instances where the defendant's future dangerousness is at issue and the defendant is, in fact, parole-ineligible, citing, e.g., Roach v. Commonwealth, 251 Va. 324, 346, 468 S.E.2d 98, 105, cert. denied, 519 U.S. 951 (1996). Thus, the Commonwealth asserts that we have declined to extend the application of Simmons to a

case where the defendant is parole-ineligible, but where the Commonwealth relies solely on the aggravating factor of the vileness of the crime.  The trial court accepted the Commonwealth's assertion that this was "the present state of the law in Virginia" and refused to grant the proposed instruction both prior to charging the jury and in responding to the jury's inquiry on this issue.

The trial court correctly noted that this Court has not heretofore applied the holding in Simmons beyond the specific factual situation of that case.  Indeed, following the United States Supreme Court's decision in Simmons and the subsequent abolition of parole in Virginia, we have not been presented with a capital murder conviction in which a defendant sentenced to death by a jury was parole-ineligible and the Commonwealth relied solely on the vileness aggravating factor, rather than relying on that factor and future dangerousness or future dangerousness alone.[5]  For example, Roach, cited by the Commonwealth, was submitted to the jury solely on the future dangerousness aggravating factor.  Thus, we are presented with an issue of first impression.  For the reasons that follow, we

_____

[5]Cf. Cardwell, 248 Va. at 515, 450 S.E.2d at 155 (assuming issue of applicability where aggravating factor is vileness was not moot, Simmons did not apply in any case because defendant was not parole-ineligible).

26

hold that the trial court erred in failing to grant the instruction requested by Yarbrough.

As we have noted, both parties rely on Simmons as the principal basis for their respective positions on this issue. Yarbrough contends that Simmons created a broad due process right "that a jury be fully informed as to what the realities of a sentence are." The Commonwealth contends that Simmons is properly limited to those cases where future dangerousness is at issue because the possibility that a mistaken belief by the jury that the defendant is eligible for early release from a life sentence would necessarily prejudice the jury in favor of imposing the death penalty if the jury believed the defendant posed a continuing threat to society. The Commonwealth asserts that this prejudice is not invoked in the jury's determination of the vile nature of a crime already committed.

We find neither of these views to be persuasive on the issue we are called upon to address in this appeal. The Simmons decision has no application to the present case because the defendant in that case did not challenge a conviction premised solely on the aggravating factor of vileness and, thus, the reliance of both parties on the analysis in that case is misplaced. Simmons was decided under the Due Process Clause of the Fourteenth Amendment, and in that decision the United States

27

Supreme Court established a minimum level of protection applicable based upon a specific factual scenario.[6] While Virginia courts are required to adhere to that minimum standard, this Court must make its own determination about what additional information a jury will be told about sentencing to ensure a fair trial to both the defendant and the Commonwealth. In this context, we agree that "the wisdom of the decision to permit juror consideration of [post-sentencing events] is best left to the States." California v. Ramos, 463 U.S. 992, 1014 (1983); see also Simmons, 512 U.S. at 183 (Scalia, J., dissenting).

Initially, we reject the Commonwealth's contention that we have declined, even by implication, to extend the rule in Simmons to a capital murder case where the defendant was parole-ineligible and the Commonwealth relied solely on the aggravating factor of vileness of the crime. Since the abolition of parole in Virginia through the enactment of Code § 53.1-165.1, a jury has imposed the death sentence only where the Commonwealth asserted the defendant's future dangerousness to society.[7] Thus,

---

[6]One of the plurality opinions in Simmons would have also applied the jury trial right of the Eighth Amendment in mandating a "life means life" instruction. See Simmons, 512 U.S. at 172 (Souter, J., concurring).

[7]Code § 53.1-165.1, in pertinent part, provides that "[a]ny person sentenced to a term of incarceration for a felony offense committed on or after January 1, 1995, shall not be eligible for

in every capital murder trial where future dangerousness was an issue and the crime occurred on or after January 1, 1995, the defendant has been parole-ineligible if convicted, and the trial courts of this Commonwealth have been required by Simmons to instruct the jury on the defendant's ineligibility for parole where such an instruction was requested by the defendant prior to the jury being instructed or following a jury's question to

parole upon that offense."  Code § 53.1-40.01 provides for parole of geriatric prisoners, but expressly excludes from its application individuals convicted of capital murder, a class one felony.  Similarly, there is no possibility of parole from a sentence of death.  Code § 53.1-151(B).

In the following cases the defendants were parole-ineligible and the jury imposed a sentence of death based upon both the future dangerousness and vileness aggravating factors: Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999); Hedrick v. Commonwealth, 257 Va. 328, 513 S.E.2d 634 (1999); Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293 (1999); Kasi v. Commonwealth, 256 Va. 407, 508 S.E.2d 57 (1998), cert. denied, ___ U.S. ___, 119 S.Ct. 2399 (1999); Swisher v. Commonwealth, 256 Va. 471, 506 S.E.2d 763 (1998); Walton v. Commonwealth, 256 Va. 85, 501 S.E.2d 134, cert. denied, ___ U.S. ___, 119 S.Ct. 602 (1998); Lilly v. Commonwealth, 255 Va. 558, 499 S.E.2d 522, cert. granted, ___ U.S. ___, 119 S.Ct. 443 (1998), judgment rev'd on other grounds, ___ U.S. ___, 119 S.Ct. 1887 (1999); Beck v. Commonwealth, 253 Va. 373, 484 S.E.2d 898, cert. denied, ___ U.S. ___, 118 S.Ct. 608 (1997).  In Jackson v. Commonwealth, 255 Va. 625, 499 S.E.2d 538, cert. denied, ___ U.S. ___, 119 S.Ct. 796 (1999), the jury imposed the death sentence based solely upon a finding of future dangerousness.  In Reid v. Commonwealth, 256 Va. 561, 506 S.E.2d 787 (1998), the death sentence was imposed by the trial court following a guilty plea based solely upon a finding of vileness; however, it is self-evident that the concerns raised by Simmons and in this appeal are not present where the sentence is imposed by the trial court.

29

the trial court on that issue during deliberations. Accordingly, in reviewing such decisions, we have applied Simmons only under a factual scenario consonant with that considered by the United States Supreme Court in that case.[8] Compare Wright v. Commonwealth, 248 Va. 485, 487, 450 S.E.2d 361, 363 (1994), cert. denied, 514 U.S. 1085 (1995)(finding that defendant was not parole-ineligible) with Mickens v. Commonwealth, 249 Va. 423, 425, 457 S.E.2d 9, 10 (1995)(finding that defendant was parole-ineligible and remanding for resentencing).  Thus, since the abolition of parole in Virginia, this appeal presents our first opportunity to consider whether the granting of an instruction on parole ineligibility is required in a capital case in which the Commonwealth relied on the vileness aggravating factor alone.

There is no constitutional right, under either the Constitution of Virginia or the United States Constitution, for a defendant to have a jury determine his sentence.  Fogg v. Commonwealth, 215 Va. 164, 165, 207 S.E.2d 847, 849 (1974).

---

[8]In doing so, we have limited our application of Simmons to the penalty-determination phase, rejecting attempts to expand its application to other procedures during trial.  See, e.g., Lilly v. Commonwealth, 255 Va. 558, 567-68, 499 S.E.2d 522, 529-30 (1998), rev'd on other grounds, ___ U.S. ___, 119 S.Ct. 1887 (1999) (holding that Simmons does not require the trial court to "educate" potential jurors on effect of parole ineligibility during voir dire).

Nonetheless, where the jury is delegated the responsibility of recommending a sentence, the defendant's right to a trial by an informed jury requires that the jury be adequately apprised of the nature of the range of sentences it may impose so that it may assess an appropriate punishment.  Cf. Commonwealth v. Shifflett, 257 Va. 34, 43, 510 S.E.2d 232, 236 (1999).  The underlying concern is whether issues are presented in a manner that could influence the jury to assess a penalty based upon "'fear rather than reason.'"  Farris v. Commonwealth, 209 Va. 305, 307, 163 S.E.2d 575, 576 (1968) (quoting State v. Nickens, 403 S.W.2d 582, 585 (Mo. 1966)).

Where information about potential post-sentencing procedures could lead a jury to impose a harsher sentence than it otherwise might, such matters may not be presented to the jury.  Thus, it has long been held in this Commonwealth that it is error for the trial court to instruct the jury that the defendant would be eligible for parole or could benefit from an executive act of pardon or clemency.[9]  See, e.g., Hinton v.

---

[9]As we have noted in prior opinions addressing this issue, this rule is by no means universal, with many states taking the position that such instructions are proper because a fully informed jury is a right of both the defendant and the state. See Hinton v. Commonwealth, 219 Va. 492, 495, 247 S.E.2d 704, 706 (1978).  See generally Annotation, Prejudicial Effect of Statement or Instruction of Court as to Possibility of Parole or Pardon, 12 A.L.R.3rd 832 (1999); Annotation, Procedure to be

Commonwealth, 219 Va. 492, 496, 247 S.E.2d 704, 706 (1978);

Jones v. Commonwealth, 194 Va. 273, 279, 72 S.E.2d 693, 696-97

(1952); Coward v. Commonwealth, 164 Va. 639, 646, 178 S.E. 797,

799 (1935).

Unquestionably, it was this long-standing rule which

prompted the trial court's refusal of Yarbrough's proffered

"life means life" instruction and its response to the jury's

question concerning the meaning of a life sentence.  However,

the present case presents the diametrically opposite situation:

a case where information about post-sentencing procedures is

needed to prevent a jury from imposing a harsher sentence than

it otherwise might render out of speculative fears about events

that cannot transpire.  Accordingly, an examination in some

detail of the cases which established this rule is warranted and

guides our further analysis as to their continued application to

capital murder prosecutions in light of the abolition of parole

under Code § 53.1-165.1.

In Coward, the jury in a drunk driving case made a specific

inquiry as to "what time the defendant would get off while he

---

Followed Where Jury Requests Information as to Possibility of
Pardon or Parole from Sentenced Imposed, 35 A.L.R.2d 769 (1997).
This division of authority, however, merely lends credence to
the views expressed in Ramos and by Justice Scalia in Simmons,
supra.

was confined in jail."  164 Va. at 643, 178 S.E. at 798.  The trial court responded to this query by detailing for the jury the then applicable rules for "good behavior" reduction of a sentence.  Id.  We held that this was error and that "[t]hese jurors should have been told that it was their duty, if they found the accused guilty, to impose such sentence as seemed to them to be just.  What might afterwards happen was no concern of theirs."  Id. at 646, 178 S.E. at 800.  This language from Coward has become the standard charge to a jury whenever an inquiry is made regarding the possibility of a defendant being paroled, pardoned, or benefited by an act of executive clemency.

In Jones, after determining that the defendant was guilty of first-degree murder, the jury inquired whether "if they gave him life imprisonment . . . they would have any assurance that the defendant would not 'get out.'"  Jones, 194 Va. at 275, 72 S.E.2d at 694.  The trial court responded that "it could not give that assurance; that would be in the hands of the executive branch of the government."  Id.  The jury imposed a sentence of death on Jones.  We reversed that sentence.

Noting that under the law then applicable, a defendant sentenced to life imprisonment for first-degree murder was not eligible for parole, this Court asked rhetorically "who can say that the verdict here would have been rendered had the jury been

33

told that the defendant could not be paroled after a sentence of life imprisonment and would not 'get out' unless pardoned by the governor?"  Id. at 278-79, 72 S.E.2d at 696.  Accordingly, we held that the trial court's instruction was erroneous because "it did not fully inform the jury upon the point to which their inquiry was directed."  Id. at 278, 72 S.E.2d at 696. Nonetheless, because the defendant would have been subject to parole if sentenced to a lesser term of years, or to pardon in any case, in giving instructions to the trial court for the remanded trial the majority adhered to the rule announced in Coward in order to avoid having the jury base its sentence "on speculative elements, rather than on the relevant facts of the case, [since this] would lead inevitably to unjust verdicts." Id. at 279, 72 S.E.2d at 697.

Concurring, Justice Spratley, joined by Justice Smith, opined that the defendant was prejudiced by the trial court's failure to inform the jury, as the defendant had requested, that if given a sentence of life imprisonment he would not be eligible for parole.  Id. at 282, 72 S.E.2d at 698 (Spratley, J., concurring).  Moreover, Justice Spratley opined that the failure to properly instruct the jury would inevitably result in juror confusion and "a reaction, just as likely against the accused as in his favor."  Id. at 281, 72 S.E.2d at 698.

34

Asserting that the view expressed by the majority of other states at that time was that the jury could best perform its duty when given full knowledge of the possible consequences of the law, Justice Spratley concluded that "had such information been given [to the jury] in simple and direct language" no prejudice would have resulted.  Id. at 283, 72 S.E.2d at 698.

The most succinct statement of the policy behind the rule announced in Coward is to be found in our subsequent decision in Hinton.  In that case, the trial court responded to a jury's question concerning parole by instructing the jurors that "early release [of prisoners] is not for the Court or jury to be concerned about."  Hinton, 219 Va. at 494, 247 S.E.2d at 705.  However, the trial court then described the manner under which early release might occur and told the jury that "[s]ometimes people never serve their entire sentence."  Id.  The trial court concluded by stating that it "would like to advise [the jury] about the probability of early release, but I'm not allowed to tell you what it is in order that you may take it into consideration when you fix punishment."  Id. at 494-95, 247 S.E.2d at 705.  Following this instruction, the jury returned in only five minutes with a verdict imposing the maximum sentence possible for the defendant's offense.  Id. at 495, 247 S.E.2d at 706.

Rejecting the Commonwealth's argument that the trial court's statement comported with the holdings in Coward and Jones, we reversed Hinton's conviction.  Noting that the issue was still a matter of serious contention among the states, we stated that "Virginia is committed to the proposition that the trial court should not inform the jury that its sentence, once imposed and confirmed, may be set aside or reduced by some other arm of the State."  Hinton, 219 Va. at 495, 247 S.E.2d at 706 (citing Coward, 164 Va. at 646, 178 S.E. at 799-800) (emphasis added).  Rejecting the Commonwealth's contention that the trial court's error was not sufficiently prejudicial to warrant reversing the conviction, we stated the policy underlying our continued adherence to the rule from Coward as follows:

> [T]he jury's question would have been necessary only if one or more of the jurors contemplated voting for a sentence less than the maximum; the inquiry would have been superfluous if the jury had already decided to assess [the maximum penalty].  Thus, as a result of the improper emphasis on post-verdict procedures . . . it [is] likely that some member of the jury, influenced by the improper remarks, agreed to fix the maximum penalty, when he or she otherwise would have voted for a lesser sentence.  Consequently, prejudice to the defendant is manifest.

219 Va. at 496-97, 247 S.E.2d at 706-07.

In sum, the policy underlying the rule first announced in Coward, and subsequently affirmed in Hinton, is that the jury should not be permitted to speculate on the potential effect of

36

parole, pardon, or an act of clemency on its sentence because doing so would inevitably prejudice the jury in favor of a harsher sentence than the facts of the case might otherwise warrant.  This prejudice to the defendant was manifest in Hinton, where the jury was required to fix punishment at a specific term of years, and in Jones, where the jury could elect between a sentence of death, of life imprisonment without possibility of parole, or a term of years from which the defendant might be paroled after a time.  We have upheld the rule from Coward and its progeny in capital murder cases where the defendant would have been eligible for parole if given a life sentence.  See, e.g., Stamper v. Commonwealth, 220 Va. 260, 278, 257 S.E.2d 808, 821 (1979), cert. denied, 445 U.S. 972 (1980).

As we have noted above, the present case presents the converse situation.  It is manifest that the concern for avoiding situations where juries speculate to the detriment of a defendant on post-sentencing procedures and policies of the executive branch of government requires that the absence of such procedures or policies favoring the defendant be disclosed to the jury.  Where a defendant is convicted of capital murder in a bifurcated jury trial, in the penalty-determination phase of the trial the jury must select solely between a sentence of life

imprisonment without possibility of parole or one of death.  The
Coward rule simply does not address that unique situation.

This unique situation arises from the fact that a defendant
sentenced to life imprisonment for capital murder, a class one
felony, is not subject to "geriatric parole."  See note 7,
supra.  Accordingly, while we recognize that the limitations
placed upon the availability of parole by Code §§ 53.1-40.01 and
53.1-165.1 may call into question the continued viability of the
Coward rule in a non-capital felony case, as where, for example,
a defendant subject to a maximum term of years for a specific
crime would serve that entire sentence before being eligible for
geriatric parole, we emphasize that our decision today is
limited to the effect of Code § 53.1-165.1 on capital murder
prosecutions.

Undeniably, in the specific circumstance where the jury
must select between only two sentences: death and life
imprisonment without possibility of parole, the jury's knowledge
that a life sentence is not subject to being reduced by parole
will cause no prejudice to the defendant, and may work to his
advantage.  It is equally clear that without this knowledge the
jury may erroneously speculate on the possibility of parole and

impose the death sentence.[10]  If the jury is instructed that the defendant's parole ineligibility is a matter of law and not one of executive discretion, there is no possibility that the jury would speculate as to whether "its sentence . . . imposed and confirmed may be set aside or reduced by some other arm of the State."  On the other hand, without this knowledge, there is a very real possibility that the jury may erroneously speculate on the continuing availability of parole.  The real danger of this possibility is amply demonstrated by the jury's question in this case in which the jurors posited the hypothetical situation that Yarbrough might serve as few as twelve years of a life sentence.

In short, whereas in the circumstances presented in some prior cases the availability of parole was not a proper matter for jury speculation because it might lead to the unwarranted imposition of harsher sentences, in the context of a capital

---

[10]These conclusions arise not merely from reasoned logic, but have been repeatedly confirmed through empirical research. Indeed, that research was cited in Simmons, 512 U.S. at 172-74 (Souter, J. concurring), and serves as the basis for a plurality of the United States Supreme Court continuing to urge expansion of the Simmons rule.  See, e.g., Brown v. Texas, 522 U.S. 940, 940-41 and n.2 (1997) (Stevens, J., dissenting) (four justices dissenting from denial of certiorari).  We note that in Brown, Justice Stevens observed that "the likelihood that the issue [of expanding the application of Simmons] will be resolved correctly may increase if this Court allows other tribunals 'to serve as laboratories in which the issue receives further study before it is addressed by this Court.'"  Id. at 943 (citation from footnote omitted).

murder trial a jury's knowledge of the lack of availability of parole is necessary to achieve the same policy goals articulated in Coward and Hinton. Moreover, a jury fully informed on this issue in this context is consistent with a fair trial both for the defendant and the Commonwealth. Accordingly, we hold that in the penalty-determination phase of a trial where the defendant has been convicted of capital murder, in response to a proffer of a proper instruction from the defendant prior to submitting the issue of penalty-determination to the jury or where the defendant asks for such an instruction following an inquiry from the jury during deliberations, the trial court shall instruct the jury that the words "imprisonment for life" mean "imprisonment for life without possibility of parole."[11] Because the trial court refused such an instruction, Yarbrough was denied his right of having a fully informed jury determine his sentence.

Finally, we must consider whether the comments concerning the effect of a life sentence made by Yarbrough's counsel during closing argument render harmless the prejudice resulting from

---

[11]We emphasize that the defendant must request the instruction. The trial court is not required to give the instruction sua sponte. Cf. Peterson v. Commonwealth, 225 Va. 289, 297, 302 S.E.2d 520, 525, cert. denied, 464 U.S. 865 (1983).

the trial court's failure to instruct the jury on the issue of Yarbrough's parole-ineligible status.[12]  The Commonwealth contends that Yarbrough adequately addressed this issue to the jury in his closing argument and, therefore, Yarbrough was not prejudiced.[13]  We disagree.

Yarbrough's counsel argued that "[l]ife is life . . . [h]e will spend a long time in prison" and made other similar comments during the closing argument which implied that Yarbrough would be ineligible for parole.  Clearly, as indicated by its subsequent inquiry to the trial court, the jury did not accept counsel's assertions as to the law.  Accordingly, we

---

[12]We have previously held that in consideration of the United States Supreme Court's decision in Caldwell v. Mississippi, 472 U.S. 320 (1985), the Commonwealth is barred from commenting on the power of the trial court and this Court to set aside a jury's sentence of death since such statements might "lead[] a jury to believe the sentencing responsibility lies 'elsewhere'."  Frye v. Commonwealth, 231 Va. 370, 397, 345 S.E.2d 267, 285 (1986).  Nothing in the view we express herein should be interpreted as diminishing that holding.

[13]In Williams v. Commonwealth, 234 Va. 168, 178-79, 360 S.E.2d 361, 367-68 (1987), cert. denied, 484 U.S. 1020 (1988), relying on Hinton, we held that a parole-ineligible defendant was not entitled to "argue the meaning of a life sentence" because "the jury is not to be concerned with what may later happen to a defendant sentenced to the penitentiary, [and] no inference can be drawn or argued one way or the other as to whether he will serve his full term."  Id. at 179, 360 S.E.2d at 368.  In light of the view expressed by a plurality of justices in Simmons, 512 U.S. at 178 (O'Connor, J., concurring), that the issue of parole ineligibility may be addressed in argument, our holding in Williams has clearly been called into question.

cannot say that Yarbrough was not prejudiced by the trial court's failure to respond to the jury's question with the appropriate instruction as Yarbrough had requested. Therefore, the death sentence in this case will be vacated.

E. Sentence Review

In view of our ruling that the sentence of death will be vacated on other grounds, we will not conduct the sentence review provided by Code § 17.1-313(C) to determine whether that sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors or whether the sentence is excessive or disproportionate to the sentences imposed in similar cases.

IV. CONCLUSION

For the reasons assigned, we will affirm Yarbrough's conviction of capital murder, vacate the death sentence, and remand the case for a new penalty-determination phase. We will affirm Yarbrough's robbery conviction and sentence of life imprisonment.

Record No. 990261 — Affirmed in part, sentence vacated, and case remanded.

Record No. 990262 — Affirmed.


JUSTICE COMPTON, with whom CHIEF JUSTICE CARRICO joins, dissenting in part.

42

I agree that Yarbrough's conviction of capital murder should be affirmed.  I disagree, however, that his death sentence should be vacated and the case remanded for redetermination of the capital murder penalty.

The majority holds that in the penalty phase of a trial when the defendant has been convicted of capital murder, either upon the defendant's tender of a proper instruction prior to submitting the issue of penalty to the jury or upon the defendant's request for such an instruction following an inquiry from the jury during deliberations, the trial court shall instruct the jury that the words "imprisonment for life" mean "imprisonment for life without possibility of parole."  This viewpoint, based upon the idea of having a "jury fully informed," even on matters not relevant for jury consideration, amounts to an unwise change in the landscape for trial of capital murder cases in Virginia when the crime meets the vileness aggravating factor.

In Virginia, a jury's duty and responsibility, upon a finding of guilt, is to impose such punishment as is authorized by law and is just and proper under the evidence, considering the crime and the defendant.  All other matters, such as probation and parole, are not relevant for jury consideration.

43

The majority seeks to justify its viewpoint by relying upon a purported distinction in the context of jury sentencing between parole ineligibility and parole eligibility. The majority discusses Hinton v. Commonwealth, 219 Va. 492, 496, 247 S.E.2d 704, 706 (1978); Jones v. Commonwealth, 194 Va. 273, 279, 72 S.E.2d 693, 696-97 (1952); and Coward v. Commonwealth, 164 Va. 639, 646, 178 S.E. 797, 799 (1935), admitting those cases stand for the proposition that a jury should not be permitted to speculate on the potential effect of parole, pardon, and executive clemency. Yet, according to the majority, "the present case presents the converse situation," to those cases. Not so. When the real basis underlying the settled rule (until today) preventing a jury from speculating is understood, the present case does not involve a "converse situation."

"Under our system, the assessment of punishment is a function of the judicial branch of government, while the administration of such punishment is a responsibility of the executive department. The aim of the rule followed in Virginia is to preserve, as effectively as possible, the separation of those functions during the process when the jury is fixing the penalty, in full recognition of the fact that the average juror is aware that some type of further consideration will usually be

given to the sentence imposed." Hinton, 219 Va. at 496, 247 S.E.2d at 706.

That statement is as applicable in 1999 as it was when written in 1978 because, even with the abolition of parole effective in 1995, "further consideration" by way of the Governor's constitutional power of executive clemency remains an avenue for relief from a mandatory life sentence for a capital murder.

Parenthetically, the majority's "fairness" concerns focus only upon the defendant, not the Commonwealth and her citizens. If the majority is truly concerned about "fairness" in directing that the jury be informed about the irrelevant matter of parole ineligibility, then the prosecution should be entitled to have the jury informed about the matter of executive clemency, in a spirit of "fairness."

Simply put, this Court, as a matter of state law, has held "[i]n an unbroken line of capital cases . . . that parole is not a proper matter for consideration by a jury." King v. Commonwealth, 243 Va. 353, 368, 416 S.E.2d 669, 677, cert. denied, 506 U.S. 957 (1992). I would adhere to that principle in this case, and would affirm Yarbrough's death sentence.