Present:  Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Kinser, JJ., and Stephenson, Senior Justice

SHERMAINE A. JOHNSON


v.  Record Nos. 992525 and 992526
                          OPINION BY JUSTICE BARBARA MILANO KEENAN
                                 April 21, 2000
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
                        James F. D'Alton, Jr., Judge


     In these appeals, we review the capital murder conviction

and death sentence imposed on Shermaine A. Johnson, along with

his conviction for rape.

                          I. PROCEEDINGS

     On January 6, 1997, petitions were issued in the Juvenile

and Domestic Relations District Court of the City of Petersburg

(juvenile court) against Johnson, charging him with the July 11,

1994 rape and capital murder of Hope Denise Hall.  Johnson was

16 years old at the time these offenses were committed.  Notice

of the juvenile court proceedings was provided to Johnson's

guardian and grandmother, Virginia Dancy.  After a hearing, the

juvenile court found probable cause to believe that Johnson had

committed the crimes alleged and entered an order certifying the

charges to the grand jury.

     On April 17, 1997, the grand jury of the Circuit Court of

the City of Petersburg (the circuit court) indicted Johnson on

charges of capital murder in the commission of rape or attempted rape in violation of Code § 18.2-31(5), and rape in violation of Code § 18.2-61.  Johnson filed numerous pretrial motions and requests for continuances during the ensuing 14 months.  On June 17, 1998, Johnson filed a motion to dismiss the indictments, arguing that the circuit court had not complied with the requirements of former Code § 16.1-296(B).  This statute required the circuit court, within a "reasonable time" after receiving the case from the juvenile court, to review the records and enter an order either remanding the case to the juvenile court or advising the Commonwealth's Attorney that he may seek indictments.

The circuit court entered an order dated June 29, 1998, stating that it had reviewed Johnson's records from the juvenile court and, upon that review, authorized the Commonwealth's Attorney to seek indictments.  The grand jury returned new indictments on July 2, 1998, and the circuit court later granted the Commonwealth's motion to enter a nolle prosequi on the original indictments.  The circuit court also entered an order stating that "[a]ll papers, documents, orders, motions, responses, letters, and arguments" contained in the court files of the original indictments were "transferred and incorporated" in the files of the new indictments.

2

In the first stage of a bifurcated jury trial conducted under Code § 19.2-264.3, the jury convicted Johnson of the offenses charged in the new indictments. In the penalty phase of the trial, the jury fixed his punishment for capital murder at death, based on findings of both "future dangerousness" and "vileness."

In a post-trial motion, Johnson sought dismissal of the indictments on the ground that the Commonwealth had failed to provide notice of the transfer proceedings in juvenile court to Johnson's father, in violation of former Code §§ 16.1-263 and -264. The trial court denied the motion, finding that "proper notice as contemplated by the statute" had been given. After considering the pre-sentence report and victim impact statements, the trial court sentenced Johnson to life imprisonment on the rape charge and, in accordance with the jury verdict, to death on the capital murder charge.

We consolidated the automatic review of Johnson's death sentence with his appeal of the capital murder conviction. Code § 17.1-313(F). We also certified Johnson's appeal of his rape conviction from the Court of Appeals and consolidated that appeal with his capital murder appeal. Code § 17.1-409.

## II. THE EVIDENCE

We will state the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below.

3

Walker v. Commonwealth, 258 Va. 54, 60, 515 S.E.2d 565, 568 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 955 (2000); Jackson v. Commonwealth, 255 Va. 625, 632, 499 S.E.2d 538, 543 (1998), cert. denied, 525 U.S. 1067 (1999); Roach v. Commonwealth, 251 Va. 324, 329, 468 S.E.2d 98, 101, cert. denied, 519 U.S. 951, (1996). On July 11, 1994, the nude body of 22-year-old Hope Denise Hall was found on the bedroom floor of her apartment in Petersburg. She had been stabbed 15 times, including fatal stab wounds to her back, chest, and neck.

Hall's body had abrasions on the nose and left cheek. The body also had a broken, ragged fingernail that Dr. Deborah Kay, an assistant chief medical examiner for the Commonwealth, testified was a "defense-type" injury. Dr. Kay also testified that death "is not generally immediate" with wounds such as those suffered by Hall, and that she initially would have remained conscious after the wounds were inflicted.

The police found blood on two "steak" knives, which were lying on a counter in Hall's kitchen. Blood was also found on a piece of a broken drinking glass located on the kitchen counter, and there was additional blood on the kitchen counter and floor. The police recovered from the kitchen floor an earring, five strands of hair, and a partial shoe print containing some blood. The matching earring was found in Hall's bedroom.

4

The outside door to Hall's apartment was locked, and the police found a partial fingerprint and smears of blood on the inside panel of that door, which was located near the kitchen. The police recovered two additional "steak" knives, one on Hall's bed and one in her bathroom. The telephone wires in her bedroom had been pulled out of the wall.

A smear of blood and blood splatters were located on the bedroom wall near the victim's body. The police found additional blood on the bedroom floor, dresser, sheets, and bedspread. There was no sign of forced entry into the apartment.

### DNA Evidence

Jean M. Hamilton, a forensic scientist employed by the Virginia Division of Forensic Science, testified that she performed DNA testing using the "polymerase chain reaction," or PCR, technique on evidence recovered from the crime scene and a blood sample and vaginal swabs collected from Hall's body during an autopsy. Hamilton concluded that the DNA from the blood found on the knife on the bed, the knives in the kitchen, the kitchen countertop, and the front door all matched the DNA from Hall's blood sample.

Hamilton determined that the DNA from Hall's blood did not match the DNA from the blood on the handle of the knife found in the bathroom. However, the blood from the broken glass in the

5

kitchen and one bloodstain on the bedspread contained a mixture of Hall's DNA and DNA from the same person whose blood was on the handle of the knife found in the bathroom.

Hamilton testified that DNA from sperm detected in two semen stains on the sheets and DNA from another stain on the bedspread came from the same person as the DNA from the blood on the bathroom knife. However, the DNA from the sperm detected in the vaginal swab taken from Hall's body came from more than one person.

Early in the investigation, an acquaintance of Hall, Leroy Quick, III, who had been observed knocking on the door of Hall's apartment on the night of the murder, was suspected of committing these crimes. Hamilton analyzed the DNA from a sample of Quick's blood. Based on her analysis, Hamilton eliminated Quick as a possible source of the DNA found on all the evidence she had analyzed.

Hamilton then performed a more discriminating type of DNA analysis, known as "restriction fragment length polymorphism" or RFLP testing, on the DNA from two semen stains found on the sheet and the bedspread. After obtaining the DNA profile from those two stains, Hamilton searched the DNA data bank maintained by the Division of Forensic Science to determine if the DNA profile obtained from the crime scene evidence matched any DNA profile on record in the DNA data bank. Hamilton did not find a

matching DNA profile at the time of her initial search in March 1996, at which time there were about 5,000 samples in the DNA data bank.

In August 1996, Hamilton performed a second search of the DNA data bank after about 2,500 more samples had been added to the bank. Hamilton's second search revealed that one DNA profile contained in the data bank was consistent with the DNA profile that she had obtained from the crime scene evidence. This matching DNA profile belonged to the defendant, Shermaine A. Johnson, who was incarcerated in the Southampton Correctional Institute.

Hamilton performed DNA testing, using the PCR technique, on another sample of Johnson's blood that was in the custody of the City of Franklin Police Department. Hamilton concluded that the DNA profile of Johnson, who is an African-American, matched the DNA found on the handle of the knife retrieved from the bathroom, some of the semen stains on the sheets, the semen stain on the bedspread, and some of the sperm in the vaginal swab. Based on the results of this PCR test, Hamilton estimated that this particular DNA profile would occur in about one out of 980 people in the Black population, or about one-tenth of 1% of that population.

Sergeant Thomas Patrick of the Petersburg Bureau of Police obtained a search warrant, which he executed on Johnson at the

7

Southampton Correctional Institute.  Pursuant to the search warrant, Patrick obtained another blood sample from Johnson, as well as head and pubic hair samples.  George Li, a supervising forensic scientist with the Virginia Division of Forensic Science, conducted RFLP testing on DNA from the blood sample obtained from Johnson and compared it to the DNA found at the crime scene.  Li concluded that Johnson's DNA matched the DNA from semen stains on the sheet and bedspread.  Li estimated that the probability of randomly selecting an individual other than Johnson with the same DNA profile as that found in the evidence taken from the crime scene was about one in one million in the Black population.

Li also conducted PCR testing on the DNA from the blood sample obtained from Johnson, and compared the results with the DNA on the knife found in the bathroom and semen stains found on the sheets and bedspread.  Based on the less discriminating PCR technique, Li estimated that the probability of a person other than Johnson having a DNA profile matching the DNA from the crime scene evidence was one in 980 in the Black population.

<u>Johnson's Statements to Police</u>

After Hamilton made the initial match of the DNA taken from the crime scene with Johnson's DNA profile obtained from the data bank, three police officers from the Petersburg Police Bureau interviewed Johnson at the Southampton Correctional

8

Institute in August 1996.  Upon signing a written waiver of his Miranda rights, Johnson told the police officers that he had been in Petersburg "quite a bit" during the summer of 1994 and had spent "a lot" of time at the apartment complex where Hall lived.  His cousin and another acquaintance lived in other buildings in the same complex.  Johnson stated that on the night Hall was murdered, he encountered her in a hallway and that they went inside her apartment and began kissing on her living room couch.  Johnson stated that an African-American man with a light complexion who had a "fade" haircut knocked on Hall's door, entered the apartment, and began arguing with Johnson. According to Johnson, this man threatened him with a knife and pushed him out of the apartment.

Johnson denied being present in any room in Hall's apartment other than the living room and denied being cut or injured in any way while in the apartment.  On further questioning, Johnson stated that he had not met Hall in the outside hallway, but had knocked on her door.

### Other Crimes Evidence

Prior to trial, the Commonwealth gave Johnson notice that it intended to present evidence during the guilt phase of the trial that Johnson had raped 21-year-old Lavonda Scott on July 2, 1994, and 15-year-old Janel Chambliss on August 31, 1994. Over Johnson's objection, the trial court permitted both Scott

9

and Chambliss to testify about these crimes, after finding that there were "numerous" similarities between the crimes committed against Scott and Chambliss and the pending charges against Johnson.

The trial court cited the following factors in its decision to permit the testimony of Scott and Chambliss. All three victims were young African-American women. Scott and Chambliss both knew Johnson and allowed him to enter their homes. There was no sign of forced entry into Hall's apartment. Johnson assaulted both Scott and Chambliss after requesting a glass of water. He then seized knives from their kitchens. There was a broken drinking glass in Hall's kitchen, and the knives used to kill Hall came from her kitchen.

Johnson forced both Scott and Chambliss to remove all their clothing before raping them. Hall's body was totally nude and her clothes were found near her body. Johnson threatened both Scott and Chambliss, stating that he would kill them if they did not follow his directions. When Chambliss resisted and struggled with Johnson, he stabbed her. There was evidence of a struggle in Hall's apartment and Hall was fatally stabbed. All three crimes occurred within a 90-day period in 1994.[1]

### Aggravating Factors

10

During the penalty phase of the trial, the Commonwealth presented evidence that in addition to the rapes of Scott, Chambliss, and Hall, Johnson committed two other rapes in 1994. The two victims of these other crimes testified at the penalty phase.  The evidence showed that in January 1994, Johnson raped a 13-year-old girl as she was walking down a flight of stairs inside her apartment building in New Jersey.  Johnson grabbed her from behind, held a "steak" knife to her throat, demanded that she remove her clothes, and raped her.  In June 1994, Johnson raped a 15-year-old girl in a friend's apartment in New York City.  Johnson stopped the girl on the street and lured her to his friend's apartment, where he threatened her with a knife, forced her to remove her clothing, and raped her.

### III. ISSUES PREVIOUSLY DECIDED

On appeal, Johnson raises certain arguments that we have resolved in previous decisions.  Since we find no reason to modify our previously expressed views, we reaffirm our earlier holdings and reject the following arguments:

A.  Imposition of the death penalty constitutes cruel and unusual punishment in violation of the United States Constitution and the Constitution of Virginia.  Rejected in Yarbrough v. Commonwealth, 258 Va. 347, 360 n.2, 519 S.E.2d 602,

---

[1]While the trial court found that all three crimes occurred within a 90-day period, the record reflects that they occurred

11

607 n.2 (1999); Jackson, 255 Va. at 635, 499 S.E.2d at 545;
Goins v. Commonwealth, 251 Va. 442, 453, 470 S.E.2d 114, 122,
cert. denied, 519 U.S. 887 (1996).

    B.  Virginia's death penalty statutes fail to provide
meaningful guidance to the jury.  Rejected in Yarbrough, 258 Va.
at 360 n.2, 519 S.E.2d at 607 n.2; Cherrix v. Commonwealth, 257
Va. 292, 299, 513 S.E.2d 642, 647, cert. denied, ___ U.S. ___,
120 S.Ct. 177 (1999); Roach, 251 Va. at 336, 468 S.E.2d at 105;
Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 674-75,
cert. denied, 513 U.S. 971 (1994).

    C.  The "vileness" factor is unconstitutionally vague and
overbroad.  Rejected in Walker, 258 Va. at 61, 515 S.E.2d at
569; Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Beck v.
Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert.
denied, 522 U.S. 1018 (1997).

    D.  The "future dangerousness" factor is unconstitutionally
vague and unconstitutionally permits the consideration of
unadjudicated conduct.  Rejected in Walker, 258 Va. at 61, 515
S.E.2d at 569; Cherrix, 257 Va. at 299, 513 S.E.2d at 647;
Clagett v. Commonwealth, 252 Va. 79, 86, 472 S.E.2d 263, 267
(1996), cert. denied, 519 U.S. 1122 (1997).

    E.  Virginia's penalty phase instructions do not adequately
instruct the jury concerning mitigation.  Rejected in Yarbrough,

_____

within a 60-day period in July and August, 1994.

258 Va. at 360 n.2, 519 S.E.2d at 607 n.2; Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Swann v. Commonwealth, 247 Va. 222, 228, 441 S.E.2d 195, 200, cert. denied, 513 U.S. 889 (1994).

F.  The post-verdict review of the death sentence by the trial court does not satisfy constitutional standards because the trial court may consider hearsay evidence contained in a pre-sentence report and is not required to set aside the death sentence upon a showing of good cause.  Rejected in Walker, 258 Va. at 61, 515 S.E.2d at 569; Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Breard, 248 Va. at 76, 445 S.E.2d at 675.

IV.  PRETRIAL MATTERS

Juvenile Transfer Issues

Johnson argues that the circuit court erred in denying his motions to dismiss both sets of indictments.  He first asserts that the original indictments were void because the circuit court failed to review the transfer record from the juvenile court under former Code § 16.1-296(B) before the original indictments were obtained.  He also argues that the original indictments were void under Commonwealth v. Baker, 258 Va. 1, 516 S.E.2d 219 (1999)(per curiam), because the Commonwealth had failed to notify Johnson's father of the transfer hearing in the juvenile court.  We disagree with Johnson's arguments.

The requirement of former Code § 16.1-296(B), that the circuit court review the transfer documents from the juvenile

13

court before allowing the Commonwealth to seek indictments, was inapplicable to Johnson's case. This review was not required because Johnson previously had been tried and convicted as an adult in the Circuit Court of Southampton County for the rape of Lavonda Scott. Code § 16.1-271 provides in relevant part:

> Any juvenile who is tried and convicted in a circuit court under the provisions of this article shall be considered and treated as an adult in any criminal proceeding resulting from any future alleged criminal acts. . . .
> All procedures and dispositions applicable to adults charged with such a criminal offense shall apply in such cases. . . . The provisions of this article regarding a transfer hearing shall not be applicable to such juveniles.

The rape of Lavonda Scott occurred on July 2 or 3, 1994, and the present offenses took place days later on July 11, 1994. Thus, the rape and capital murder of Hope Hall were "future alleged criminal acts" within the meaning of Code § 16.1-271, and Johnson was not entitled to the protection that the transfer statutes afford a juvenile offender who has not previously been tried and convicted as an adult in a circuit court. Accordingly, since Johnson's prior conviction as an adult eliminated the requirement of former Code § 16.1-296(B) that the circuit court review the transfer proceedings, his claim that the review was not performed in a timely manner has no merit.

The provisions of Code § 16.1-271 also invalidate Johnson's claim that the indictments were void because his father was not provided notice of the transfer proceedings in the juvenile

14

court.  Under the plain language of Code § 16.1-271, a juvenile who has been convicted as an adult in a circuit court is not entitled to a transfer hearing in the juvenile court.  Since Johnson had no right to a transfer hearing, the notice requirements pertaining to such a hearing are inapplicable and do not provide a basis for challenging either set of indictments returned in this case.

Johnson next contends that the Commonwealth's failure to try the charges against him within five months of his preliminary hearing violated his right to a speedy trial under Code § 19.2-243.  He asserts that the 16-month interval between the preliminary hearing and trial is attributable solely to the Commonwealth's failure to seek a timely review of the transfer documents from the juvenile court.

The record demonstrates that there is no merit to Johnson's claim.  Johnson's preliminary hearing and resulting probable cause determination occurred in the juvenile court on March 20, 1997.  Johnson either requested or agreed to every continuance granted by the circuit court under the original indictments, and Johnson conceded this fact in argument before the circuit court. When the time attributable to those continuances is subtracted from the total time this case was pending in the circuit court before trial, the record shows that Johnson was tried within the

15

time restrictions imposed by Code § 19.2-243.[2]  See Townes v.

Commonwealth, 234 Va. 307, 323, 362 S.E.2d 650, 659 (1987) cert.

denied, 485 U.S. 971 (1988); Robinson v. Commonwealth, 28 Va.

App. 148, 155-56, 502 S.E.2d 704, 708 (1998); Watkins v.

Commonwealth, 26 Va. App. 335, 347-48, 494 S.E.2d 859, 865

(1998).

Johnson also argues that the trial court erred in

incorporating in the present case, which was tried under the new

indictments, all pleadings filed and rulings made under the

original indictments.  He contends that the circuit court lacked

jurisdiction to take this action after the original indictments

had been terminated by nolle prosequi, asserting that a new

preliminary hearing in the juvenile court was required.  Johnson

also contends that because the original indictments were

terminated by nolle prosequi, all pretrial proceedings conducted

under the original indictments were effectively nullified.

Thus, he argues that there were no rulings or pleadings before

the trial court that could have been incorporated in the

prosecution on the new indictments.  We disagree.

As discussed above, since Johnson previously had been tried

and convicted as an adult for rape, the Commonwealth was not

required to institute new proceedings in the juvenile court.

---

[2]Although Johnson contended in the circuit court that his
constitutional right to a speedy trial also was violated, he has

16

Code § 16.1-271. Instead, the Commonwealth was entitled to consider and treat Johnson as an adult and obtain new indictments in the circuit court. See Code § 19.2-217; Payne v. Warden of Powhatan Correctional Center, 223 Va. 180, 183, 285 S.E.2d 886, 887-88 (1982).

The new indictments were identical to the old indictments and, thus, presented exactly the same issues that Johnson raised before the circuit court in the original indictments. The nolle prosequi of the original indictments did not invalidate the trial court's rulings in that case, but simply terminated the original prosecution and discharged Johnson from liability on those indictments. See Miller v. Commonwealth, 217 Va. 929, 935, 234 S.E.2d 269, 273 (1977), cert. denied, 434 U.S. 1016 (1978). The circuit court was not required to rehear the same matters and reissue the same rulings simply because the Commonwealth mistakenly had concluded that the original indictments may have been invalid. Thus, we hold that the circuit court's decision to incorporate the prior rulings in the present case was a proper exercise of the court's discretion.[3]

---

not asserted this argument on appeal.

[3]At oral argument in these appeals, Johnson argued for the first time that if Code § 16.1-271 required that he be treated as an adult, then the original indictments, and all pretrial proceedings conducted pursuant to those indictments, were void because the juvenile court lacked jurisdiction to initiate any proceedings against Johnson. We find no merit in this argument,

## Motions to Suppress Fruits of Search Warrant

Johnson argues that the 32-day interval between the time Hamilton first matched DNA from the crime scene with Johnson's DNA profile in the DNA data bank, and the time the search warrant was executed, constituted an "unreasonable delay." He contends that the evidence obtained as a result of the search warrant, namely, the blood sample, hair samples, and his statement to the police, should have been suppressed based on this "unreasonable delay." We disagree.

There is no fixed standard or formula establishing a maximum allowable interval between the date of events recited in an affidavit and the date of a search warrant. United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1984); Huff v. Commonwealth, 213 Va. 710, 715, 194 S.E.2d 690, 695 (1973); Perez v. Commonwealth, 25 Va. App. 137, 142-43, 486 S.E.2d 578, 581 (1997). Instead, a warrant will be tested for "staleness" by considering whether the facts alleged in the warrant provided probable cause to believe, at the time the search actually was conducted, that the search conducted pursuant to the warrant would lead to the discovery of evidence of criminal activity.

---

because the original indictments were obtained pursuant to the circuit court's jurisdiction over Johnson, which existed independently of the proceedings in juvenile court. See Code § 19.2-217. We also note that Johnson agreed at oral argument that the new indictments, under which he was tried and convicted, were valid.

18

<u>McCall</u>, 740 F.2d at 1336; <u>Perez</u>, 25 Va. App. at 142, 486 S.E.2d at 581; <u>see</u> <u>United States v. Akram</u>, 165 F.3d 452, 456 (6th Cir. 1999); <u>Huff</u>, 213 Va. at 715-16, 194 S.E.2d at 695.

Here, Johnson's contention of "staleness" fails because the DNA from the crime scene evidence and his DNA profile from the DNA data bank, which were "matched" by Hamilton and formed the basis for issuance of the warrant, were not subject to change over the 32-day period at issue. The blood and hair samples taken from Johnson pursuant to the search warrant also were not subject to change over this time period. <u>See</u> <u>State v. Baker</u>, 956 S.W.2d 8, 13 (Tenn. Crim. App. 1997)(holding that samples of person's blood, saliva, and hair cannot become "stale.") Thus, we hold that the search warrant was valid and the trial court did not err in refusing to suppress the evidence at issue. Since the search warrant was valid, we also conclude that there is no merit in Johnson's allegation that the statement he made to the police should have been suppressed as a fruit of the search conducted pursuant to that warrant.

<u>Constitutionality of Virginia's DNA Data Bank</u>

Johnson argues that the statutes providing for the Commonwealth's DNA data bank, Code §§ 19.2-310.2 through -310.7 (DNA statutes), which include a requirement that all convicted felons submit blood samples for DNA testing, violate various constitutional rights. He contends that these statutes violate

19

the Fourth Amendment guarantee against unreasonable searches and seizures, the Fifth Amendment protection against self-incrimination, and the Eighth Amendment guarantee against cruel and unusual punishment. He further contends that the DNA statutes violate his constitutional right of due process. Johnson also relies on the parallel provisions of the Constitution of Virginia that articulate these constitutional rights. Finally, Johnson contends that these statutes are arbitrary and unreliable, fail to establish meaningful restrictions on the seizure and dissemination of DNA material, and constitute an "undue delegation of [legislative] powers." We disagree with Johnson's arguments.

The DNA statutes do not deny a criminal defendant any constitutional rights. Although we have not considered previously the issues Johnson raises, the United States Court of Appeals for the Fourth Circuit has addressed the constitutionality of Virginia's DNA statutes in two cases. In Jones v. Murray, 962 F.2d 302 (4th Cir.) cert. denied, 506 U.S. 977 (1992), the Court concluded that the procurement of a blood sample for DNA analysis from a convicted felon under Code § 19.2-310.2 does not violate the Fourth Amendment guarantee against unreasonable searches and seizures. The Court held that "in the case of convicted felons who are in the custody of the Commonwealth, we find that the minor intrusion caused by the

20

taking of a blood sample is outweighed by Virginia's interest

. . . in determining inmates' 'identification characteristics

specific to the person' for improved law enforcement." Id. at

307 (quoting Code § 19.2-310.2); see also Ewell v. Murray, 11

F.3d 482, 484 (4th Cir. 1993), cert. denied, 511 U.S. 1111

(1994).  We agree with this conclusion and hold that it is

equally applicable to the guarantee against unreasonable

searches and seizures set forth in Article I, Section 10 of the

Constitution of Virginia.

We also conclude that the Fifth Amendment right against

self-incrimination, and the parallel right afforded by Article

I, Section 8 of the Constitution of Virginia, are not violated

by the DNA statutes.  The taking of a blood sample does not

implicate any rights against self-incrimination, because such an

act is not testimonial or communicative in nature.  Schmerber v.

California, 384 U.S. 757, 761 (1966); Shumate v. Commonwealth,

207 Va. 877, 880, 153 S.E.2d 243, 245 (1967); Lawrence v.

Bluford-Brown, 1 Va. App. 202, 204, 336 S.E.2d 899, 900-01

(1985).  Thus, the withdrawal of blood from a convicted felon to

provide a DNA sample for inclusion in the DNA data bank in

accordance with Code § 19.2-310.2 does not violate the felon's

constitutional protection against self-incrimination.

Next, we conclude that the DNA statutes do not violate the

Eighth Amendment guarantee against cruel and unusual punishment,

21

and the parallel right secured by Article 1, Section 9 of the Constitution of Virginia. The DNA statutes are not penal in nature. Ewell, 11 F.3d at 485; Jones, 962 F.2d at 309. Therefore, there is no merit to Johnson's contention that the above rights are "subverted" by the requirement that a DNA blood sample be taken from persons convicted of a felony.

We also disagree with Johnson's argument that the DNA statutes violate federal constitutional rights of due process and the due process provisions of Article I, Section 11 of the Constitution of Virginia. In support of his argument, Johnson states merely that the DNA statutes do not "require that notice be given to individuals whose DNA is seized." This argument has no merit because the enactment of the statutes themselves in 1990 provided notice that all persons convicted of a felony will be required to give a blood sample for DNA analysis.

We also reject Johnson's arguments that the DNA statutes are arbitrary and unreliable, fail to establish meaningful restrictions on the seizure and dissemination of DNA material, and constitute an "undue delegation of [legislative] powers." The statutes apply uniformly to every convicted felon, and the use of the information collected from each felon is restricted to law enforcement purposes. Code §§ 19.2-310.2, -310.5, and -310.6. Further, since Johnson does not explain why the statutes

are an "undue delegation" of powers, we do not address this argument because we are unable to discern its substance.

## Batson Challenge

During jury selection, the prosecutor used all five of her peremptory strikes to remove African-Americans from the venire. Johnson asserted a challenge to the panel under Batson v. Kentucky, 476 U.S. 79 (1986). After noting that the jury panel, which included two alternate jurors, was comprised of ten African-Americans, one Hispanic, and three Caucasians, the trial court ruled that Johnson had failed to establish a prima facie case of racial exclusion under Batson. The trial court stated: "It's clear the jury is predominantly black . . . . There was no questioning in the voir dire or anything to suggest any racial inferences. So I do not find that a prima facie case has been made."

Johnson argues on appeal that the trial court violated the holding in Batson in failing to require the prosecutor to state race-neutral reasons for each of her peremptory strikes. In response, the Commonwealth contends that the trial court did not err under Batson because the circumstances surrounding the prosecutor's use of her peremptory strikes did not raise an inference that these strikes were made to exclude potential jurors based on their race. We agree with the Commonwealth.

23

In Batson, the Supreme Court stated the requirements for establishing a prima facie case of purposeful discrimination in the selection of a petit jury.  The Court held that to establish such a prima facie case,

> the defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96.  The trial court's determination whether discrimination has occurred in the selection of a jury is entitled to great deference.  Id. at 98 n.21.

The defendant has the burden of producing a record that supports a prima facie case of purposeful discrimination.  United States v. Escobar-De Jesus, 187 F.3d 148, 164 (1st Cir. 1999), cert. denied, ___U.S.___, 68 U.S.L.W. 3534 (U.S. Feb.22, 2000)(No. 99-7685); Atkins v. Commonwealth, 257 Va. 160, 174, 510 S.E.2d 445, 454 (1999); Kasi v. Commonwealth, 256 Va. 407, 421, 508 S.E.2d 57, 65 (1998), cert. denied, ___ U.S. ___, 119 S.Ct. 2399 (1999); see Batson, 476 U.S. at 96-97.  The fact that the prosecution has excluded African-Americans by using

24

peremptory strikes does not itself establish such a prima facie case under Batson. See 476 U.S. at 96-97; United States v. Sangineto-Miranda, 859 F. 2d 1501, 1521 (6th Cir. 1988). A defendant also must identify facts and circumstances that raise an inference that potential jurors were excluded based on their race. Batson, 476 U.S. at 96; Escobar-De Jesus, 187 F.3d at 164.

The composition of the jury that ultimately is sworn is a relevant consideration in reviewing a Batson challenge. Sangineto-Miranda, 859 F.2d at 1521-22; see Escobar-DeJesus, 187 F.3d at 165. The jury selected in this case was comprised overwhelmingly of African-Americans. We also observe that none of the prosecutor's questions or statements to the venire indicated that the prosecutor was of a mind to discriminate in her exercise of peremptory strikes.

In addition, no other facts or circumstances in the present record support an inference of purposeful discrimination by the prosecutor in the jury selection process. Therefore, we conclude that the record supports the trial court's ruling that Johnson failed to make a prima facie showing of purposeful discrimination under Batson. Since Johnson failed to establish such a prima facie case, the prosecutor was not required to provide a

25

racially neutral explanation for her exercise of peremptory strikes.

## Appointment of Co-Counsel

Johnson next argues that the trial court erred in denying his request for the appointment of co-counsel with specialized knowledge relating to DNA evidence to assist his court-appointed attorney in addressing issues presented by the Commonwealth's use of such evidence. Johnson contends that he was denied effective assistance of counsel because his court-appointed attorney, by his own admission, did not have the expertise necessary to evaluate the DNA evidence linking Johnson to these crimes.

We find no merit in these arguments. Johnson withdrew his request for appointment of co-counsel prior to trial and instead asked the trial court to appoint a DNA expert, which request was granted.[4] Therefore, by withdrawing his request for co-counsel in the trial court, Johnson has waived his claim that the trial court erred in denying his request for co-counsel with specialized knowledge relating to the use of DNA evidence. Further, to the extent that Johnson has raised a claim of ineffective assistance of counsel in this argument, we do not consider that contention in this appeal. See Roach, 251 Va. at

---

[4]Johnson elected not to call his appointed DNA expert as a witness.

335 n.4, 468 S.E.2d at 105 n.4; <u>Hall v. Commonwealth</u>, 30 Va. App. 74, 82, 515 S.E.2d 343, 347 (1999); 1990 Va. Acts of Assembly, ch. 74 (repealing Code § 19.2-317.1, which provided for direct appeal of certain ineffective assistance of counsel claims); <u>see also</u> <u>Walker v. Mitchell</u>, 224 Va. 568, 570, 299 S.E.2d 698, 699 (1983).

## Photographs of Victim

On this subject, Johnson has assigned error on the following basis:  "The trial court erred in denying [d]efendant's motion to exclude certain photographs of the victim."  However, Johnson has not addressed this assignment of error in his brief, except with regard to "buttons" displaying a photograph of the victim worn by certain members of the public while in the courtroom.  Therefore, our consideration of this assignment of error will be limited to the buttons worn in the courtroom, and we will not consider the trial court's admission of photographs of the victim into evidence during trial.  <u>See</u> Rules 5:27, 5:17(c)(4).

Johnson contends that Hall's family and friends were allowed to wear "campaign-size" buttons displaying Hall's photograph in the courtroom.  Johnson asserts that although the jurors were not seated close enough to the audience to identify Hall's image on the buttons, they could tell that the buttons

27

"ha[d] something to do with" Hall and, thus, the jurors were improperly influenced.

We find no merit in this argument. There is nothing in the record to support Johnson's contention that any of the jurors saw buttons displaying Hall's photograph. When Johnson raised his objection to the buttons at the beginning of trial, the court ruled that the spectators would not be permitted to display the buttons in any manner that would allow the jurors to see them. The court also ruled that anyone wearing a button was required to refrain from any contact with any of the jurors. After the trial court stated these rulings, Johnson did not object to the adequacy of the trial court's response or later argue that any spectator had violated the trial court's instructions. Thus, Johnson has waived any objection to the trial court's rulings in response to his request that the buttons "not be displayed." Rule 5:25.

### V. GUILT PHASE ISSUES

#### Other Crimes Evidence

Johnson argues that the trial court erred in admitting the testimony of Lavonda Scott and Janel Chambliss during the guilt phase of his trial. He asserts that the facts in the cases of Scott, Chambliss, and Hall contain no common aspects that are so distinctive or idiosyncratic that they would permit an inference that the same person committed all three crimes. We disagree.

28

The standard governing the admission of evidence of other crimes in the guilt phase of a criminal trial is well established.  Generally, evidence that shows or tends to show that a defendant has committed a prior crime is inadmissible to prove the crime charged.  Guill v. Commonwealth, 255 Va. 134, 138, 495 S.E.2d 489, 491 (1998); Woodfin v. Commonwealth, 236 Va. 89, 95, 372 S.E.2d 377, 380 (1988), cert. denied, 490 U.S. 1009 (1989); Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).

There are several exceptions to the general rule excluding this type of evidence.  Among other exceptions, evidence of other crimes is admissible when relevant to show a perpetrator's identity, if certain requirements are met.  We discussed those requirements in Chichester v. Commonwealth, 248 Va. 311, 326-27, 448 S.E.2d 638, 649 (1994), cert. denied, 513 U.S. 1166 (1995):

> [O]ne of the issues upon which "other crimes" evidence may be admitted is that of the perpetrator's identity, or criminal agency, where that has been disputed.  Proof of *modus operandi* is competent evidence where there is a disputed issue of identity.
>
> . . . .
>
> [E]vidence of other crimes, to qualify for admission as proof of *modus operandi*, need not bear such an exact resemblance to the crime on trial as to constitute a "signature."  Rather, it is sufficient if the other crimes bear a "singular strong resemblance to the pattern of the offense charged."  That test is met where the other incidents are "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof," thus tending to establish the probability of a common perpetrator.

29

. . . .

> If the evidence of other crimes bears sufficient marks of similarity to the crime charged to establish that the defendant is probably the common perpetrator, that evidence is relevant and admissible if its probative value outweighs its prejudicial effect . . . The trial court, in the exercise of its sound discretion, must decide which of these competing considerations outweighs the other. Unless that discretion has been clearly abused, we will affirm the trial court's decision on this issue.

Id. (quoting Spencer v. Commonwealth, 240 Va. 78, 89-90, 393 S.E.2d 609, 616-17, cert. denied, 498 U.S. 908 (1990)(citations omitted)); see also Turner v. Commonwealth, 259 Va. ___, ___, ___ S.E.2d ___, ___ (2000) decided today; Guill, 255 Va. at 138-39, 495 S.E.2d at 491-92.

Applying the Spencer standard, we conclude that the trial court did not abuse its discretion in admitting the testimony of Scott and Chambliss in the guilt phase of the trial. The three crimes bear a singular strong resemblance to one another, based on common incidents that are sufficiently idiosyncratic to establish the probability of a common perpetrator. In addition, the record supports a finding that the probative value of this evidence of other crimes outweighed its potential prejudicial effect.

The crimes committed against Scott, Chambliss, and Hall occurred within a 60-day period. The victims were all young African-American women. Each victim knew Johnson, and there

30

were no signs of forced entry into the dwellings in which the crimes occurred. In each case, the attacker used a "steak" knife that he obtained in the victim's dwelling. Each victim was raped, and the attacker stabbed the victims who resisted him.

The attacker asked Scott and Chambliss for a drink of water before he attacked them, and a bloodstained broken drinking glass was found in the kitchen of Hall's apartment. Hamilton estimated that the DNA from the blood found on the broken glass, which matched Johnson's DNA, would occur once in 980 times in the Black population. Finally, the attacker ordered both Scott and Chambliss to disrobe completely, and Hall's clothes were found intact on the floor of her apartment near her nude body.

## Chain of Custody of Blood Sample

Johnson argues that the trial court erred in admitting into evidence the analysis of the blood sample taken from him for inclusion in the DNA data bank while he was incarcerated at Southampton Correctional Institute in September 1995. He asserts that the Commonwealth did not establish the chain of custody of the blood sample, and he contends that the Commonwealth had "insufficient controls . . . to conclusively track a sample once it reaches the lab to insure that one specimen is not mixed with another." We find no merit in this argument.

31

A chain of custody is properly established when the Commonwealth's evidence provides reasonable assurance that the sample to be admitted at trial is the same sample, and in the same condition, as when it was first obtained. Vinson v. Commonwealth, 258 Va. 459, 469, 522 S.E.2d 170, 177, (1999); Pope v. Commonwealth, 234 Va. 114, 121, 360 S.E.2d 352, 357 (1987), cert. denied, 485 U.S. 1015 (1988). Thus, under this standard, the Commonwealth is not required to eliminate every conceivable possibility of substitution, alteration, or tampering. Pope, 234 Va. at 121, 360 S.E.2d at 357; Alvarez v. Commonwealth, 24 Va. App. 768, 776, 485 S.E.2d 646, 650 (1997).

In the present case, the Commonwealth proved that Ann Chavis drew Johnson's blood, and that she taped and initialed the vial containing the sample before delivering it to Deborah Harrell. Harrell kept the sample in her custody until delivering it to Diane Hamilton at the Division of Forensic Science DNA laboratory. The sample remained in the custody and control of the DNA laboratory until it was analyzed.

We also note that under Code § 19.2-187.01, an attested report of analysis from the Division of Forensic Science is prima facie evidence of custody from the time a sample is received by the laboratory until it is released after testing. Johnson presented no evidence to overcome the Commonwealth's introduction of this prima facie evidence, or the direct

evidence of actual custody of the blood sample.  Therefore, the Commonwealth met its burden of demonstrating a reasonable assurance that Johnson's blood sample was the same sample, and in the same condition, as when it first was obtained.

Testimony of DNA Expert Witnesses

Johnson contends that Jean Hamilton and George Li lacked sufficient expertise to testify concerning "population and statistical genetics."  Thus, he disputes the admission of their testimony regarding the statistical probability that someone other than Johnson would have the same DNA profile as the donor of the DNA found on evidence collected from Hall's apartment. We disagree with Johnson's argument.

The issue whether a witness is qualified to testify as an expert on a given subject is a matter submitted to the trial court's discretion, and the trial court's ruling in this regard will not be disturbed on appeal unless it plainly appears that the witness was not qualified.  Spencer v. Commonwealth, 238 Va. 295, 305, 384 S.E.2d 785, 792 (1989), cert. denied, 493 U.S. 1093 (1990); Lane v. Commonwealth, 223 Va. 713, 718, 292 S.E.2d 358, 361 (1982); Wileman v. Commonwealth, 24 Va. App. 642, 647, 484 S.E.2d 621, 624 (1997).

Li testified that he was the supervisor of forensic biology examiners at the Division of Forensic Science laboratory in Richmond, and that he also conducted forensic biology

examinations as part of his duties.  Li holds a Master of Science degree in forensic science.  He received training in DNA analysis, including statistical issues involved in such analysis, from the Federal Bureau of Investigation.  Li had trained both investigators and technicians on the theory and technique of DNA typing, and was an instructor in the graduate program in forensic science at Virginia Commonwealth University.  He had performed DNA analyses on thousands of samples and previously had qualified as an expert witness in the field of forensic science.  He explained that forensic DNA analysis involves a determination whether a person can be eliminated as a source of DNA found at a crime scene, as well as a determination regarding how frequently a particular DNA profile appears in the general population.

Hamilton testified that she holds a Master of Science degree in forensic science, and has been employed by the Commonwealth Division of Forensic Science for 12 years as a forensic scientist.  She also completed undergraduate and graduate level courses in statistics.  Hamilton explained that part of her work in DNA analysis involves an assessment of the approximate frequency that a particular DNA profile appears in the general population.  She also stated that she previously has testified as an expert witness regarding such probabilities.  Based on this foundation testimony, we conclude that the trial

court did not abuse its discretion in allowing Li and Hamilton to testify concerning the statistical probabilities at issue in this case.

## Evidence of Third Party Guilt

Johnson argues that the trial court erred in refusing to allow him to present testimony that would have proved that Leroy Quick, III, was the person who raped and murdered Hope Hall. Johnson proffered the testimony of Natalie Williams, Hall's co-worker, who would have testified that Hall received flowers from Quick shortly before she was murdered, and that Hall told Williams that Hall did not "want to have anything to do with" Quick because he was "crazy." Johnson also proffered the testimony of three women who worked in the rental office of Hall's apartment complex who would have testified that within 30 days before the murder, Hall expressed "concern and apprehension" about a person she used to date.[5] One of these rental office workers, Dolores Reid, also would have testified that about one month before the murder, she saw Leroy Quick grab Hall in an attempt to "get her to go from one room to another."

---

[5]Johnson also argues on appeal that the trial court erred in refusing to admit testimony from two of Hall's neighbors who saw Quick approach Hall's apartment the night she was murdered. However, the record reveals that the defense presented the testimony of these two neighbors. The defense also called Officer Carter Burnette of the Petersburg Bureau of Police who testified concerning the neighbors' statements and their identification of Quick from photographic lineups.

We find no merit in Johnson's argument that the trial court abused its discretion in refusing to admit this evidence. Proffered evidence "that merely suggests a third party <u>may</u> have committed the crime charged is inadmissible; only when the proffered evidence tends <u>clearly</u> to point to some other person as the guilty party will such proof be admitted." <u>Soering v. Deeds</u>, 255 Va. 457, 464, 499 S.E.2d 514, 518 (1998). We have stated that "a large discretion must and should remain vested in the trial court as to the admission of this class of testimony." <u>Karnes v. Commonwealth</u>, 125 Va. 758, 766, 99 S.E. 562, 565 (1919); <u>see</u> <u>also</u> <u>Oliva v. Commonwealth</u>, 19 Va. App. 523, 527, 452 S.E.2d 877, 880 (1995); <u>Weller v. Commonwealth</u>, 16 Va. App. 886, 890, 434 S.E.2d 330, 333 (1993).

In <u>Karnes</u>, we reversed a defendant's conviction because the trial court refused to admit evidence of death threats that a third party had made to the victim shortly before she was murdered. 125 Va. at 766-67, 99 S.E. at 565. In <u>Oliva</u>, the Court of Appeals reversed a defendant's conviction because the trial court excluded testimony from a witness who had observed someone other than the defendant, but who resembled him, running from the scene of the crime. 19 Va. App. at 528-29, 452 S.E.2d at 881.

In contrast to the evidence at issue in <u>Karnes</u> and <u>Oliva</u>, the proffered testimony at issue here bore no direct relation to

the crimes charged.  Instead, the proffered testimony tended to prove only that Hall had a poor relationship with Quick, and such evidence would have invited the jury to speculate that these difficulties caused Quick to rape and murder Hall. Moreover, Hamilton testified that she had eliminated Quick as a possible source of the DNA found on the crime scene evidence. Thus, we hold that the trial court did not abuse its discretion in excluding the proffered evidence.

## Sufficiency of Evidence of Rape

Johnson argues that the trial court erred in denying his motion to strike the rape charge and the reference to rape or attempted rape in the capital murder charge.  He contends that the evidence was insufficient to support a finding of rape because there was no evidence of trauma to Hall's vaginal area, no evidence of penetration, and only one injury, a ragged fingernail, that could be considered a defensive injury.  We disagree with Johnson's argument.

"Rape is defined as 'sexual intercourse against the victim's will by force, threat, or intimidation.'"  Wilson v. Commonwealth, 249 Va. 95, 100, 452 S.E.2d 669, 673, cert. denied, 516 U.S. 841 (1995)(quoting Hoke v. Commonwealth, 237 Va. 303, 310, 377 S.E.2d 595, 599, cert. denied, 491 U.S. 910 (1989)); see Code § 18.2-61.  "Penetration by a penis of a vagina is an essential element of the crime of rape; proof of

37

penetration, however slight the entry may be, is sufficient."
Moore v. Commonwealth, 254 Va. 184, 186, 491 S.E.2d 739, 740
(1997)(quoting Elam v. Commonwealth, 229 Va. 133, 115, 326
S.E.2d 685, 686 (1985)).

Hamilton testified that the DNA from the sperm taken from
Hall's vagina matched Johnson's DNA sample.  The presence of
Johnson's sperm in Hall's vagina alone is sufficient to support
the finding that penetration occurred.  Spencer, 238 Va. at 284,
384 S.E.2d at 780.  The evidence also was overwhelming that Hall
did not consent to having sexual intercourse with Johnson.  Hall
sustained 15 stab wounds in her struggle with her attacker.  She
also sustained facial abrasions, and she had a broken fingernail
that Dr. Deborah Kay characterized as a "defense-type" injury.
Thus, the trial court did not err in refusing to strike the rape
charge and the reference to rape and attempted rape in the
capital murder charge.

## VI.  SENTENCE REVIEW

### Passion and Prejudice

Under Code § 17.1-313(C), we review the death sentence
imposed on Johnson to determine whether it (1) was imposed under
the influence of passion, prejudice, or any other arbitrary
factor; or (2) is excessive or disproportionate to the penalty
imposed in similar cases, considering both the crime and the
defendant.  Johnson contends that the jury imposed the death

sentence based on passion after the Commonwealth presented emotional testimony from Hall's mother and the father of Hall's young son, as well as the testimony of the two victims of the rapes Johnson committed in New Jersey and New York.  We find no merit in this argument.

The victim impact evidence received in this case addressed the substantial impact that Hall's murder had on the lives of her mother and her son.  This testimony plainly was admissible for the jury's consideration in the sentencing process.  See Payne v. Tennessee, 501 U.S. 808, 827 (1991); Kasi, 256 Va. at 422, 508 S.E.2d at 65; Beck, 253 Va. at 381, 484 S.E.2d at 903.  In addition, the evidence of other rapes committed by Johnson was admissible since it was relevant to the jury's determination of future dangerousness.  See Orbe v. Commonwealth, 258 Va. 390, 401, 519 S.E.2d 808, 814 (1999); Walker, 258 Va. at 64, 515 S.E.2d at 571.  Based on our independent review of the entire record as required by Code § 17.1-313(C)(1), we conclude that there is no evidence that the death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor."[6]

---

[6]At oral argument in this appeal, Johnson argued for the first time that the trial court erred in failing to instruct the jury that he was ineligible for parole, pursuant to Simmons v. South Carolina, 512 U.S. 154, 168-69 (1994).  We do not consider this argument on appeal because Johnson failed to raise it in the trial court or in his brief filed with this court.  See

Excessiveness and Proportionality

Johnson contends that the death sentence imposed in this case is disproportionate and excessive when compared to the penalties imposed on other 16-year-old males who committed like offenses.  In support of his argument, he cites the dissenting opinion in Jackson, 255 Va. at 652-56, 499 S.E.2d at 555-57.  We disagree with Johnson's argument.

In conducting our proportionality review, we must determine whether "other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993); see also Hedrick v. Commonwealth, 257 Va. 328, 342, 513 S.E.2d 634, 642 cert. denied, ___ U.S. ___, 120 S.Ct. 376 (1999).  We compare the record in this case with the records of other capital murder cases, including those cases in which a life sentence has been imposed.  We have examined the records of all capital cases reviewed by this Court pursuant to Code § 17.1-313(E).  Since the jury imposed the death sentence based on both the future dangerousness and vileness predicates, we give particular

Rules 5:25 and 5:17(c).  We also observe that when the jury inquired whether a life sentence would allow the possibility of parole, and the trial court instructed the jury to follow the

40

consideration to other capital murder cases in which the death penalty was obtained under both predicates.

Johnson's age at the time he committed the offenses is only one factor to consider in determining whether other juries generally impose the death sentence for similar crimes.  The record also shows that he committed five rapes within a seven-month period.  Johnson beat and stabbed one rape victim, in addition to inflicting multiple stab wounds in his murder of Hall.  The stab wounds inflicted on Hall that resulted in her murder reflect an aggravated battery of the victim and an escalating pattern of violence in Johnson's commission of the five rapes cited above.

Juries in this Commonwealth generally, with some exceptions, have imposed the death sentence for convictions of capital murder based on findings of future dangerousness and vileness in which the underlying predicate crimes involved violent sexual offenses and the defendant had committed violent offenses on other occasions.  See, e.g., Vinson, 258 Va. 459, 522 S.E.2d 170; Cherrix, 257 Va. 292, 513 S.E.2d 642; Hedrick, 257 Va. 328, 513 S.E.2d 634; Barnabei v. Commonwealth, 252 Va. 161, 477 S.E.2d 270 (1996), cert. denied, 520 U.S. 1224 (1997); Wilson, 249 Va. at 105, 452 S.E.2d at 676; Williams v.

---

instructions given and not concern itself with "what happens after sentence," Johnson did not raise an objection.

41

Commonwealth, 248 Va. 528, 450 S.E.2d 365 (1994), cert. denied, 515 U.S. 1161 (1995); Breard, 248 Va. at 89, 445 S.E.2d at 682; Mueller v. Commonwealth, 244 Va. 386, 422 S.E.2d 380 (1992) cert. denied, 507 U.S. 1043 (1993); Spencer, 238 Va. 295, 384 S.E.2d 785; Coleman v. Commonwealth, 226 Va. 31, 307 S.E.2d 864 (1983), cert. denied, 465 U.S. 1109 (1984).  Based on this review, we hold that Johnson's death sentence is neither excessive nor disproportionate to penalties imposed by other sentencing bodies in the Commonwealth for comparable crimes, considering both the crime and the defendant.

## VII. CONCLUSION

We find no reversible error in the judgments of the trial court.  Having reviewed Johnson's death sentence pursuant to Code § 17.1-313, we decline to commute the sentence of death. Accordingly, we will affirm the trial court's judgments.


Record No. 992525 — Affirmed.
Record No. 992526 — Affirmed.